Joseph J. Torres (Admitted *Pro Hac Vice*)
Sheila P. Frederick (Admitted *Pro Hac Vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone:    312-558-5600
Facsimile:    312-558-5700
Email:  jtorres@winston.com
          sfrederick@winston.com

Robert Spagat (SBN: 157388)
Allison M. Dibley (SBN: 213104)
WINSTON & STRAWN LLP
101 California Street
San Francisco, California 94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
Email:  rspagat@winston.com
          adibley@winston.com

Attorneys for Defendant
THE ABBOTT SEVERANCE PAY PLAN
FOR FORMER U.S. GUIDANT
EMPLOYEES, 2006 EDITION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARK MURRAY,<br><br>       Plaintiff,<br><br>      v.<br><br>THE ABBOTT SEVERANCE PAY PLAN<br>FOR FORMER U.S. GUIDANT<br>EMPLOYEES, 2006 EDITION,<br><br>      Defendant. | CASE NO.: C 08-00906 JW<br><br>**ADMINISTRATIVE RECORD** |

Defendant, The Abbott Severance Pay Plan for Former U.S. Guidant Employees, 2006 Edition, hereby submits the Administrative Record on the above-captioned matter.

Dated: July 31, 2008                      WINSTON & STRAWN LLP

/s/ Joseph J. Torres
By: Joseph J. Torres
Attorney for Defendant
THE ABBOTT SEVERANCE PAY PLAN FOR
FORMER U.S. GUIDANT EMPLOYEES, 2006
EDITION

1

# INDEX TO ADMINISTRATIVE RECORD

| Document | Description |
|---|---|
| AR 1-13 | The Abbott Severance Pay Plan for Former U.S. Guidant Employees, 2006 Edition |
| AR 14 | May 11, 2006 Resignation/Claim Letter |
| AR 15 | July 20, 2006 Email string re Change in Control and Severance Claim |
| AR 16 | July 21, 2006 Agreement re Change in Control Claim |
| AR 17-20 | August 11, 2006 Claim Denial Letter |
| AR 21-24 | September 26, 2006 Appeal Letter |
| AR 25 | November 28, 2006 Appeal Review Extension Letter |
| AR 26-35 | December 19, 2006 Response to Information Request |
| AR 36-49 | January 30, 2007 Supplement to Appeal Letter |
| AR 50-53 | March 19, 2007 Appeal Denial Letter |

# THE ABBOTT SEVERANCE PAY PLAN

## FOR FORMER U.S. GUIDANT EMPLOYEES

### 2006 EDITION

APRIL 21, 2006

## 1.    INTRODUCTION

Abbott Laboratories has established the Abbott Severance Pay Plan for Former U.S. Guidant Employees, 2006 Edition to provide severance pay benefits to eligible Employees who lose their jobs because of certain events specified in the Plan. The Plan's purpose is to provide economic assistance to eligible Employees who become unemployed due to these events. This document sets out the Plan's provisions in effect on **April 21, 2006**. It serves as both the official Plan document and the summary description of the Plan required by ERISA. It replaces and supersedes any other Plan document, summary, or description you may have received previously.

The Glossary at Section 10 of this Plan defines the capitalized words and terms used throughout this Plan. When you encounter a capitalized word or term, you should turn to the Glossary to find its meaning.

## 2.    PARTICIPATION IN THE PLAN

Participation in the Plan is limited to Eligible Regular Employees. You will become a participant in the Plan as of the date you become an Eligible Regular Employee.

## 3.    FUNDING OF PLAN BENEFITS

Payments under the Plan are made directly from Abbott's general assets.

## 4.    SEVERANCE PAY BENEFITS

### a.    Conditions for Receiving Benefits.

The Plan provides benefits only in the event of a Qualifying Termination. If your employment is to be terminated due to a Qualifying Termination, you will receive a Notice to that effect, which will specify the date on which your employment is expected to terminate. If your employment with Abbott terminates due to a Qualifying Termination, and you are a participant in the Plan as of your termination date, you will be entitled to receive benefits under the Plan if you satisfy the conditions specified in the Plan. As a condition for receiving any Plan benefits (other than outplacement assistance), you will be required to sign a Severance Agreement and Release. See Section 4.d. below for more information about the Severance Agreement and Release requirement.

### b.    Qualifying Termination.

A Qualifying Termination is a termination of regular employment with Abbott due to a permanent reduction in force or the elimination of your job or position.

- 1 -

AR 2

The following events are **not** considered to be a Qualifying Termination, and you will **not** receive Plan benefits, if Abbott determines that your employment is terminated for any of the following reasons:

1.    Employee-initiated voluntary resignation;

2.    Misconduct;

3.    Unsatisfactory work performance;

4.    A layoff that is expected to be short-term (that is, not greater than 90 days);

5.    Breach of an employment agreement;

6.    Merger with, or acquisition by, another organization, if you continue employment with or are hired by the new organization without an extended break in service; or

7.    Any termination other than one that is due directly to a permanent reduction in force or the elimination of your position.

In addition, you will not have a Qualifying Termination if, either before or after you receive a Notice, you accept an offer of employment in another position with Abbott, or you decline an employment offer from Abbott for a position that Abbott considers to be functionally equivalent to your current position and that will not require you to relocate. Abbott has sole discretion to determine whether a position is functionally equivalent to your current position and whether a position would require you to relocate.

c.    **Benefits.**

Except as provided below, if your employment with Abbott is terminated due to a Qualifying Termination while you are a participant in the Plan, you will be entitled to the following benefits if (1) you timely sign a Severance Agreement and Release as described in Section 4.d. below, and (2) you do not revoke the Severance Agreement and Release during the Revocation Period:

1.    Severance Pay:  Upon your termination of employment with Abbott, you will become entitled to receive Severance Pay in a lump sum payment, which will be paid to you by the later of (1) the next regular pay day following your termination of employment, or (2) 5 business days after the end of the Revocation Period (unless you revoke the Severance Agreement and Release within the Revocation Period).  The amount of your Severance Pay will be equal to two weeks of Pay for every Year of Service with Abbott.

2.    Cost of Living Adjustment:  If you are receiving a relocation cost of living adjustment ("COLA") as of the date of your termination of employment,

- 2 -

you will receive, at the same time that you receive your Severance Pay, a lump sum equal to the monthly amount of the COLA multiplied by the lesser of 3 or the number of months until the end of your COLA schedule.

3.    <u>Medical, Dental, Vision, and Employee Assistance Plan Premiums</u>: If you are covered by Abbott's medical, dental, vision, or employee assistance plans at the time of your termination of employment, and you elect to continue that coverage for yourself and your eligible dependents after your termination pursuant to the federal law known as COBRA, Abbott will pay your entire COBRA premium for continued medical, dental, vision, and employee assistance plan coverage for 6 calendar months after the month in which your termination of employment occurs (or, if earlier, until your COBRA coverage ends). Except as provided in the following paragraph, this benefit is limited to payment of the cost of COBRA coverage under the Abbott plans in which you participated as of your termination date. You will not have the option to receive pay in lieu of this benefit.

In the event you are eligible to enroll for coverage under the Retiree Medical Plan at the time of your Qualifying Termination, if you choose to enroll in the Retiree Medical Plan rather than to elect COBRA continuation coverage under your current medical plan, Abbott will pay, during the period described in the following sentence, a portion of your cost of coverage under the Retiree Medical Plan (for you and any eligible dependents who enroll for coverage under the plan) equal to the full monthly premium for COBRA continuation coverage under your current Abbott medical plan for you and, if applicable, your eligible dependents who enroll under the Retiree Medical Plan. Abbott will pay this portion of the cost of Retiree Medical Plan coverage for 6 calendar months after the month in which your termination of employment occurs or, if earlier, until your coverage (including coverage for your spouse and dependents) under the Retiree Medical Plan ends. You will not have the option to receive pay in lieu of this benefit, and you will not receive cash in addition to this benefit in the event the amount of the applicable COBRA premium is greater than the applicable charge for coverage under the Retiree Medical Plan.

<u>Outplacement Assistance</u>: Abbott will provide, and will pay the cost of, outplacement assistance to help you in your search for new employment. The nature, extent, and provider of these outplacement services will be determined by Abbott in its discretion. This benefit is limited to payment of the actual costs for services rendered. You will not have the option to receive pay in lieu of outplacement assistance.

**AR 4**

d.    <u>Severance Agreement and Release.</u>

The Plan provides generous and valuable benefits that are in addition to your regular pay and benefits. Accordingly, the Plan's benefits (other than outplacement assistance) will be conditioned on your execution of a Severance Agreement and Release. The Severance Agreement and Release will be a written document, in a form determined by the Company, intended to create a binding agreement by you to release any claim that you have or may have against Abbott and certain related entities and individuals, that arise on or before the date on which you sign the Severance Agreement and Release, including, without limitation, any claims under the federal Age Discrimination in Employment Act ("ADEA"). The Severance Agreement and Release may also impose additional requirements determined by the Company in its discretion, including, without limitation, confidentiality requirements, non-disparagement obligations, reporting requirements, a requirement that you cooperate with Abbott in connection with any lawsuits or disputes with respect to which you have information or may be a witness, and a requirement to return company property. You will generally have a period of at least 21 days (or 45 days, in the case of group termination) to consider the Severance Agreement and Release before signing it, and you will be advised to consult an attorney before signing the Severance Agreement and Release. You may also have the right to revoke the Severance Agreement and Release within the Revocation Period. If you revoke the Severance Agreement and Release within the Revocation Period, you will not be entitled to any benefits under the Plan (other than outplacement assistance).

Although you may be given a copy of the Severance Agreement and Release before your termination date, you must wait until after your termination of employment to sign the Severance Agreement and Release. The Plan Administrator will not accept any Severance Agreement and Release signed on or before your termination date. You must sign the Severance Agreement and Release by the deadline communicated to you in writing, which will generally be at least 21 days (or 45 days, in the case of a group termination) after you receive a copy of the Severance Agreement and Release. If you do not sign the Severance Agreement and Release by the applicable deadline, or you revoke the Severance Agreement and Release within the Revocation Period, you will not be entitled to any benefits under the Plan (other than outplacement assistance.

e.    <u>Death</u>

If you die after you receive a Notice but before your scheduled termination date, the Severance Pay (and any COLA) that would have been payable to you will be paid to your estate. Also, if you are an Employee located in the United States and have any dependents who elect COBRA continuation coverage under Abbott's medical, dental, vision, or employee assistance plans after your death, Abbott will pay the full COBRA premium for that coverage for 6 calendar months after the month in which your death occurs (or, if earlier, when COBRA continuation coverage ends). If you have dependents who would have been eligible to enroll in the Retiree Medical Plan upon your Qualifying Termination and they choose to enroll in the Retiree Medical Plan rather than to elect COBRA continuation coverage under your current medical plan, Abbott will pay, for the first 6 calendar months in which your dependents are covered by the Retiree Medical Plan (or, if less the total number of months in which they are covered by the Retiree Medical Plan) a portion of their cost of coverage under the Retiree

- 4 -

Medical Plan equal to the full monthly premium for COBRA continuation coverage under your current medical plan for your eligible dependents who enroll under the Retiree Medical Plan. Your dependents will not have the option to receive cash in lieu of this benefit, and they will not receive cash in addition to this benefit in the event the amount of the applicable COBRA premiums is greater than the applicable charge for coverage under the Retiree Medical Plan.

### f. Authorized Leave of Absence (Including Disability Leave).

If you are placed on an Authorized Leave of Absence, either before or after the date of your Notice, your Authorized Leave of Absence will not have any effect on your status or your benefits under the Plan.

## 5.    PLAN ADMINISTRATOR

The Plan Administrator administers the Plan and is a named fiduciary of the Plan within the meaning of ERISA. The Plan Administrator has the discretionary authority to interpret all Plan provisions and to determine all issues arising under the Plan, including issues of eligibility, coverage, and benefits. The Plan Administrator's failure to enforce any provision of this Plan will not affect its right later to enforce the provision or any other provision of the Plan. The Plan Administrator may delegate some of its responsibilities under the Plan to its agents.

## 6.    CLAIMS PROCEDURES

All claims for unpaid benefits should be made in writing to the Abbott Corporate Benefits Department, Abbott Laboratories, 200 Abbott Park Road, AP51-2, D589, Abbott Park, IL 60064-6222 (the "Claims Administrator").

The Claims Administrator may request additional information necessary to consider the claim further. If a claim is wholly or partially denied, the Claims Administrator will notify the claimant of the adverse decision within a reasonable period of time, but not later than 90 days after receiving the claim, unless the Claims Administrator determines that special circumstances require an extension. In such case, a written extension notice shall be furnished before the end of the initial 90-day period. The extension cannot exceed 90 days. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the Claims Administrator expects to render the decision.

The claim determination time frames begin when a claim is filed, without regard to whether all the information necessary to make a claim determination accompanies the filing.

Any notice of denial shall include:

1.    The specific reason or reasons for denial with reference to those specific Plan provisions on which the denial is based,

2.    A description of any additional material or information necessary to perfect the claim and an explanation of why that material or information is necessary; and

- 5 -

**AR 6**

3.    A description of the Plan's appeal procedures and time frames, including a statement of the claimant's right to bring a civil action under ERISA following an adverse decision on appeal.

A claimant, or a claimant's authorized representative, may appeal a denied claim within 60 days after receiving the Claims Administrator's notice of denial. A claimant has the right to:

1.    Submit to the Claims Administrator, for review, written comments, documents, records and other information relating to the claim;

2.    Request, free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the claimant's claim; and

3.    A review on appeal that takes into account all comments, documents, records, and other information submitted by the claimant, without regard to whether such information was submitted or considered in the initial claim decision.

The Plan Administrator or his delegee will make a full and fair review of the appeal and may require additional documents as it deems necessary in making such a review. A final decision on review shall be made within a reasonable period of time, but not later than 60 days following receipt of the written request for review, unless the Plan Administrator determines that special circumstances require an extension. In such case, a written extension notice will be sent to the claimant before the end of the initial 60-day period. The extension notice shall indicate the special circumstances and the date by which the Plan Administrator expects to render the appeal decision. The extension cannot exceed a period of 60 days.

The appeal time frames begin when an appeal is filed, without regard to whether all the information necessary to make an appeal decision accompanies the filing.

If an extension necessary because the claimant failed to submit necessary information, the days from the date the Plan Administrator sends the extension notice until the claimant responds to the request for additional information are not counted as part of the appeal determination period.

The Plan Administrator's notice of denial on appeal shall include:

1.    The specific reason or reasons for denial with reference to those Plan provisions on which the denial is based;

2.    A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of all documents, records, and other information relevant to the claimant's claim; and

3.    A statement describing any voluntary appeal procedures offered by the Plan and the claimant's right to obtain the information about such procedures, and a statement of the claimant's right to bring an action under ERISA.

- 6 -

**AR 7**

## 7.    REQUIRED STATEMENT OF YOUR RIGHTS

As a participant in the Plan, you are entitled to certain rights and protections under ERISA if you are an Employee located in the United States.

The following lengthy statement concerning rights of participants under ERISA is required by regulations issued by the U.S. Department of Labor. ERISA provides that all Plan participants are entitled to:

*Receive Information About Your Plan and Benefits*

1.    Examine, without charge, at the Company's offices and other specified locations such as work sites, all Plan documents and copies of all documents filed by the Plan with the U.S. Department of Labor, such as annual reports. You may obtain a copy of the latest annual report (Form 5500 series) filed by the Plan at the Public Disclosure Room of the Employee Benefits Security Administration.

2.    Obtain copies of all Plan documents governing the operation of the Plan, including the latest annual report (Form 5500 series), updated summary plan descriptions, and other information upon written request to Abbott. Abbott may make a reasonable charge for the copies.

3.    Receive a summary of the Plan's annual financial report. The Company is required by law to furnish each member with a copy of this summary annual report.

*Prudent Actions by Plan Fiduciaries*

In addition to creating rights for Plan participants, ERISA imposes duties on the people responsible for the operation of the Plan. These people, called "fiduciaries," have a duty to operate the Plan prudently and in the interest of you and other Plan participants and beneficiaries. Neither Abbott nor any other person may terminate your employment or discriminate against you to prevent you from obtaining a Plan benefit or exercising your rights under ERISA.

*Enforce Your Rights*

If your claim for a benefit is denied or ignored in whole or in part, you have the right to know why this was done, to obtain copies of all documents relating to the decision without charge, and to appeal any denial, all within certain time limits.

Under ERISA, there are steps that you can take to enforce the rights described above. For example, if you request materials from the Plan that the Plan is required to provide and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day

(as adjusted from time to time for changes in the cost of living) until you receive the materials, unless the materials were not sent because of reasons beyond the Plan Administrator's control. If you have a claim for a Plan benefit that is denied or ignored, in whole or in part, you may file suit in a state or federal court. In addition, if you disagree with the Plan Administrator's decision concerning the qualified status of a medical child support order, or if the Plan administrator fails to make a determination as to the qualified status of the order, you may file suit in a federal court.

If Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds that your claim is frivolous.

*Assistance With Your Questions*

If you have any questions about the Plan, you should contact your local benefits administrator. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest Area Office of the Employee Benefits Security Administration, U.S. Department of Labor listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210. You may obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## 8. AMENDMENT AND TERMINATION OF PLAN

The Company has the right to change the Plan and the benefits provided by the Plan from time to time by action of the Board of Directors or Board of Review of Abbott Laboratories. In addition, the Company has the right to terminate the Plan at any time by action of its Board of Directors or Board of Review.

## 9. SPECIFIC INFORMATION REQUIRED BY ERISA

| | |
|---|---|
| Plan Name: | The Abbott Severance Pay Plan for Former US Guidant Employees, 2006 edition |
| Name, Address, and Telephone Number of Plan Sponsor: | Abbott Laboratories 100 Abbott Park Road Abbott Park, IL 60064-6400 (847) 937-6100 |
| Plan Sponsor's Identification No.: | 36-0698440 |
| Type of Plan: | The Plan is a welfare benefit plan providing severance pay benefits to eligible Employees. |

- 8 -

**AR 9**

| | |
|---|---|
| Plan administrator | Senior Vice President of Human Resources of Abbott. |
| Claims | Submit claims to: Abbott Corporate Benefits Department Abbott Laboratories 200 Abbott Park Road, AP51-2, D589 Abbott Park, IL 60064-6222 |
| Appeals | Senior Vice President of Human Resources of Abbott. |
| Agent for Service of Legal Process: | Process may be served on the Plan Administrator by direction to the Divisional Vice President Corporate Benefits & Wellness |
| Date of End of Plan Year: | December 31 |
| Basis of Keeping Records: | Calendar year |

## 1O.    GLOSSARY

Wherever used in this document, the following words and terms have the following meanings, unless a different meaning is clearly indicated by the context.

**Abbott**.  Abbott includes the Company and its subsidiaries and affiliates that are owned, directly or indirectly, at least 80% by the Company.

**Authorized Leave of Absence**.  An Authorized Leave of Absence is a leave of absence granted by Abbott, in accordance with its established personnel policies, (1) due to an Employee's Disability; (2) pursuant to the Family and Medical Leave Act of 1993 for Employees located in the United States; or (3) as otherwise required by applicable local, state, or federal law.

**Company**.  The Company is Abbott Laboratories.

**Commissions**.  Commissions are the sales commissions that a sales representative receives for selling a product.

**Disability**.  You have a Disability if a physician has certified in writing, in a form acceptable to the Plan Administrator, that you have an illness, injury, or other medical condition (including pregnancy) that renders you unable to perform the material duties of your assigned position. The Plan Administrator reserves the right to require proof of Disability and continuing Disability in accordance with its established personnel policies.

**Eligible Regular Employee**.  An Eligible Regular Employee is a Regular Employee (other than a temporary employee) who: (1) transferred employment to subsidiaries of Abbott Laboratories on April 21, 2006, in connection with the purchase by Abbott

- 9 -

**AR 10**

Laboratories of the Vascular Intervention and Endovascular Solutions Business Groups; or (2) is employed by Guidant Endovascular Solutions, Inc., or Advanced Cardiovascular Systems, Inc., or (3) is employed by Abbott Laboratories, Inc. to support the Vascular Intervention and Endovascular Solutions Business Groups.

**Employee**. Employee is an individual who is employed in the U.S. and receives compensation from Abbott that Abbott initially reports on a Federal Wage and Tax Statement (Form W-2). If Abbott treats a person as an independent contractor or contingent personnel for tax or labor law purposes, and that person is later determined to be an employee of Abbott by the Internal Revenue Service or any other federal, state or local government agency or court of competent authority, that person will become an Employee on the date the determination is finally adjudicated or otherwise accepted by Abbott. Such a person will not, under any circumstances, be treated as an Employee for the period of time during which Abbott treated the person as an independent contractor, even if the determination of employee status has retroactive effect.

**ERISA**. ERISA is the Employee Retirement Income Security Act of 1974, as amended from time to time, and interpretative regulations.

**Guidant**. Guidant is Guidant Corporation and its subsidiaries and affiliates. purchased by Abbott on April 21, 2006.

**Notice**. A Notice is a written notice given to an Employee by Abbott to inform the Employee that his or her employment with Abbott will be terminating due to a Qualifying Termination.

**Pay**. Your Pay consists of your base pay (at the rate applicable to you on your termination date); Transitional Pay at a monthly rate based on the Transitional Pay you received during the 12 full months immediately preceding the date of your Notice (or, if you have not received Transitional Pay for at least 12 full months, the average of the Transitional Pay you received during all of the full months in which you received Transitional Pay during the 12 month period immediately preceding the date of your Notice); and, if you were receiving Commissions as of the date of your Notice, Commissions at a monthly rate based on the Commissions you received for the 12 full months immediately preceding the date of your Notice (or, if you have not been employed by Abbott for 12 full months, the average of the Commissions you received during all of the full months you were employed by Abbott immediately before the date of your Notice).

**Plan**. The Plan is The Abbott Severance Pay Plan for Former U.S. Guidant Employees, 2006 Edition as set forth in this document and as amended from time to time.

**Plan Administrator**.    Senior Vice President, Human Resources, Abbott Laboratories

**Purchase Agreement**.    The Purchase Agreement is that certain Purchase Agreement, by and between the Company and Guidant Corporation dated April 20, 2006.

- 10 -

**AR 11**

**Qualifying Termination**. A Qualifying Termination is the termination of your employment with Abbott that Abbott determines is due to (1) a permanent reduction in force, or (2) the elimination of your job or position. A Qualifying Termination **does not** include termination because of Employee-initiated voluntary resignation; misconduct; unsatisfactory work performance; a layoff that is expected to be short-term (not more than 90 days); breach of an employment agreement; merger with, or acquisition by, another organization if you continue employment with or are hired by the new organization without an extended break in service; or any termination other than one that is due directly to a permanent reduction in force or the elimination of your position. In addition, you will not have a Qualifying Termination if, either before or after you receive a Notice, you accept an offer of employment in another position with Abbott or you decline an offer of employment from Abbott for a position that Abbott considers to be functionally equivalent to your current position and that will not require you to relocate. Abbott has sole discretion to determine whether a position is functionally equivalent to your current position and whether a position would require you to relocate.

**Regular Employee**. You are a Regular Employee if you are an Employee who is regularly scheduled to work at least 20 hours per week for Abbott.

**Retiree Medical Plan**. The Retiree Medical Plan is Abbott Retirement Health Plan for Former Guidant Employees..

**Revocation Period**. Your Revocation Period is the period of time during which certain Employees may revoke the Severance Agreement and Release. The Revocation Period, which will be specified in the Severance Agreement and Release, will be at least 7 days from the date you sign the Severance Agreement and Release, and it may be longer, depending on applicable law.

**Severance Agreement and Release**. A Severance Agreement and Release is a written agreement between Abbott and an Employee, in a form specified by Abbott, to which the Employee, as a condition of receiving benefits under the Plan (other than outplacement assistance), agrees to release Abbott and certain related entities and individuals from all claims that the Employee has or may have against any or all of them that arise on or before the date on which the Employee signs the Severance Agreement and Release, including, without limitation, for Employees located in the United States, claims under the federal Age Discrimination in Employment Act ("ADEA"). The Severance Agreement and Release may also impose additional requirements determined by Abbott, in its discretion, including, without limitation, confidentiality requirements, non-disparagement obligations, reporting requirements, a requirement that the Employee cooperate with Abbott in connection with any litigation or other disputes with respect to which the Employee may have information or be a witness, and a requirement to return company property.

**Severance Pay**. Severance Pay is a lump sum benefit payable to an eligible Employee under the Plan upon a Qualifying Termination, as described in Section 4 of this Plan.

**Transitional Pay**. Transitional Pay is temporary pay that is granted in the discretion of Abbott paid to you in connection with an Abbott-requested transfer to a lower-paying position.

**Year of Service**.  A Year of Service is a 12-consecutive-month period, beginning on the date an individual is hired by Abbott, during which the individual is an Employee.  A Year of Service also includes the period beginning on the Employee's date of hire or an anniversary of that date and ending on the date of the Employee's Qualifying Termination, if that period is less than 12 full months.  Years of Service shall also include the Years of Service credited to an Eligible Regular Employee under the Guidant Severance Pay Plan, 2004 Edition immediately prior to April 21, 2006.

May 11, 2006

To: John Capek, Bob Boehm

Subject: Resignation Letter Update

I will be resigning from the organization effective May 12, 2006.

Effective with my termination I am formally requesting a claim for all payments, benefits and rights under "The Guidant Corporation Change In Control Severance Pay Plan For Select Employees" which was adopted by the Guidant Corporation Board of directors on April 1, 1995.

In addition I am requesting a claim for all payments, benefits and rights under all other Severance Plans or related plans.

It has been a privilege to serve for almost 21 years.

Thanks

Mark A. Murray

**Cushman, Elizabeth (SC)**

| | |
|---|---|
| **From:** | Mike L Meyer [mike.l.meyer@abbott.com] |
| **Sent:** | Thursday, July 20, 2006 5:12 PM |
| **To:** | Bonn, Maxine G (ABT); Cushman, Elizabeth (SC) |
| **Subject:** | Fw: Severance |
| **Attachments:** | Guidant Severance Pay Plan.doc; resignation.doc; Sev Pay Plan 2004.pdf |

```
Max and Liz,

I believe that Mark is ineligible for the severance plan. Let's discuss at CIC meeting
next week and then we can proceed from there. Thanks.
-------------------------
Sent from my BlackBerry Wireless Handheld
```

```
----- Original Message -----
From: "Mark Murray" [mamurray1@comcast.net]
Sent: 07/20/2006 05:59 PM
To: <mike.l.meyer@abbott.com>
Subject: Severance
```

Mike,

In my resignation letter (see attachment) I stated the following:

*"Effective with my termination I am formally requesting a claim for all payments, benefits and rights under "The Guidant Corporation Change In Control Severance Pay Plan For Select Employees" which was adopted by the Guidant Corporation Board of directors on April 1, 1995.*

*In addition I am requesting a claim for all payments, benefits and rights under all other Severance Plans or related plans."*

After nearly two months since my termination we have achieved agreement on The Guidant Corporation Change In Control Severance Pay Plan for Select Employees. However, I have not heard any response from Abbott regarding the other Severance Plans. For your convenience I have included copies of at least two of those plans which I had received from Bob Boehm and Doug Wilson. It is clear to me and my counsel that I am entitled to Severance Payments under these plans as well.

Can you please respond to me on how we can conclude on this in a timely fashion?

Also, it is my understanding that you are moving to a new assignment within Abbott, therefore if you are not the correct contact person within Abbott, please provide that individuals name and corresponding contact information.

Regards,

Mark Murray

8/10/2006

July 21, 2006


Mr. Michael L. Meyer
Group Vice President, Global HR
Abbott Laboratories
D069M, Bldg. AP6B-2
100 Abbott Park Road
Abbott Park, Il 60064

Dear Mike:


Pursuant to The Guidant Corporation Change in Control Severance Pay Plan For Select Employees, Abbott will provide me with a severance payment of $641,473.57 (the "Severance Payment").

I am aware of Section 409A of the Internal Revenue Code of 1986 and understand the potential additional tax should the "Severance Payment" be distributed within six months of the date of my separation of service from Abbott (May 12, 2006).

As such, the "Severance Payment" will be delayed six months (payment to be made by Abbott Laboratories on November 15, 2006) for which I consent to this delay. To induce Abbott to delay payment of the "Severance Payment", I further agree to waive any right to the payment of interest on the "Severance Payment" to which I would otherwise be entitled under Section 7 of The Guidant Corporation Change in Control Severance Pay Plan For Select Employees. As such, I release in full Abbott Laboratories and its subsidiaries and their officers, directors, employees, representatives, agents, attorneys and stockholders from any liability, claims or obligations with respect to interest payments under Section 7 of The Guidant Corporation Change in Control Severance Pay Plan For Select Employees.

Regards,

Mark A. Murray


Agreed and Accepted:


7/24/06
By Abbott Laboratories

Date:



Abbott

James F. Coppens                    1: 847.938.8320
Divisional Vice President, Benefits  F: 847.938.7914
Dept. 589 Bldg. AP51-2
200 Abbott Park Road
Abbott Park, IL 60064-6222

August 11, 2006

Mark Murray
13742 Orleans Court
Saratoga, CA 95070

Dear Mr. Murray:

Mike Meyer has given me your letter of May 11, 2006, in which you request severance benefits under "all other Severance Plans or related plans." The severance plan to which you make reference is the Abbott Severance Pay Plan for Former U.S. Guidant Employees, 2006 Edition (the "2006 Plan"). Under the 2006 Plan, claims decisions are made by the Corporate Benefits Department of Abbott Laboratories. The 2006 Plan was adopted by Abbott Laboratories to provide Guidant employees who joined Abbott on April 21, 2006 ("Close"), with benefits substantially comparable to benefits provided under the Guidant Severance Pay Plan, 2004 Edition (the "2004 Plan"). The 2004 Plan will be cited herein solely for your information. As Divisional Vice President, Benefits, I am responsible for responding to our claim for benefits.

## Plan Terms

Under Section 4(a) of the 2006 Plan (and Section 4(a) of the 2004 Plan), benefits are paid in the event of a Qualifying Termination. A Qualifying Termination is a termination of regular employment with Abbott due to a permanent reduction in force or the elimination of your job or position. 2006 Plan at Section 4(b) (2004 Plan at Section 4(b)). The 2006 Plan (and similarly, the 2004 Plan) also states:

> The following events are <u>not</u> considered to be a Qualifying Termination, and you will <u>not</u> receive Plan benefits, if Abbott determines that your employment is terminated for any of the following reasons:
> 1.     Employee-initiated voluntary resignation
> ....
> 6.     Merger with, or acquisition by, another organization, if you continue employment with or are hired by the new organization without an extended break in service
> ....



**Abbott**
A Promise for Life

**AR 17**



Mark Murray
August 11, 2006
Page 2 of 4

In addition, you will not have a Qualifying Termination if, either before or after you receive a Notice, you accept an offer of employment in another position with Abbott, or you decline an employment offer from Abbott for a position that Abbott considers to be functionally equivalent to your current position and that will not require you to relocate. Abbott has sole discretion to determine whether a position is functionally equivalent to your current position and whether a position would require you to relocate.

(2006 Plan at Section 4(b))(2004 Plan at Section 4(b))

## Facts

You were Vice President, Finance for Guidant Vascular Intervention until approximately August 2004. As such, your responsibilities included managerial analysis and financial performance, measurement and planning. You reported to Keith Brauer, Vice President and Chief Financial Officer of Guidant Corporation. In August 2004, as the result of a company-wide reduction in force and the related consolidation of corporate responsibilities, you assumed responsibility for financial management of Guidant Cardiac Surgery and Guidant Endovascular Solutions, Inc. You continued to report to Mr. Brauer until Close. During the period you served as Vice President, Finance, both before and after you assumed responsibility for Guidant Cardiac Surgery and Guidant Endovascular Solutions, Inc., your employment grade was EX 8.

After Close, Abbott asked you to continue in your position as Vice President, Finance and to again focus your work on Cardiac Therapies (previously, Vascular Intervention). Your grade level was unchanged. Abbott offered you the same compensation, benefits, and bonus opportunity that you enjoyed prior to Close. You were also offered a retention package which consisted of your change in control benefit, a retention bonus and 7,000 restricted stock units.

By letter dated May 11, 2006, you informed John Capek and Bob Boehm of your decision to terminate your employment effective May 12, 2006.

## Analysis

A Qualifying Termination is a termination of regular employment with Abbott due to a permanent reduction in force or the elimination of your job or position. Neither has occurred in your case. Your employment was not terminated as a result of a permanent reduction in force or a position elimination.



**AR 18**



Mark Murray
August 11, 2006
Page 3 of 4

Moreover, under the 2006 Plan (and the 2004 Plan), an employee-initiated voluntary resignation such as yours is not a Qualifying Termination, and an employee who voluntarily resigns is denied plan benefits. Additionally, when an employee is hired by the new organization without an extended break in service following a merger or acquisition, the employee has not had a Qualifying Termination. Here, Abbott sought to continue to employ you without change on even more favorable terms than you had in your pre-Close role; however, you chose instead to voluntarily resign.

Finally, the 2006 Plan (and similarly, as to Guidant, the 2004 Plan) specifically provides that no benefits are available if you decline an employment offer from Abbott for a position that Abbott considers to be functionally equivalent to your current position and that will not require you to relocate. You were a vice president of finance pre-Close, and Abbott offered you employment as a vice president of finance post-Close. Your employment grade and level would remain unchanged post-Close, and you would work in the same functional area, namely, finance. Abbott considers that your positions –that held pre-close and that offered post-close -- are functionally equivalent, utilizing the same skills, education and experience considered necessary to the level of performance uniformly required of an Abbott vice president of finance on a company-wide basis.

Accordingly, your claim for benefits under the 2006 Plan is denied.

## Right to Appeal

You may appeal this decision within 60 days after receiving this notice of denial. You have a right to:

1.  Submit to the undersigned, as the Claims Administrator, for review, written comments, documents, records and other information relating to the claim;

2.  Request, free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim; and

3.  A review on appeal with the Plan Administrator that takes into account all comments, documents, records, and other information submitted by the claimant, without regard to whether such information was submitted or considered in the initial claim decision. The address of the Plan Administrator is Senior Vice President of Human



Mark Murray
August 11, 2006
Page 4 of 4

Resources, Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064-6400.

The Plan Administrator or his delegee will review your appeal and may require additional documents. A final decision on review will be made within 60 days following receipt of your written request for review, unless the Plan Administrator determines that special circumstances require an extension. In such case, a written extension notice will be sent to you before the end of the initial 60-day period. The appeal time frames begin when an appeal is filed, without regard to whether all the information necessary to make an appeal decision accompanies the filing.

As a participant in the Plan, you are entitled to certain rights and protections under ERISA. You are entitled to:

1.  Examine, without charge, at the Company's offices and other specified locations such as work sites, all Plan documents and copies of all documents filed by the Plan with the U.S. Department of Labor, such as annual reports. You may obtain a copy of the latest annual report (Form 5500 series) filed by the Plan at the Public Disclosure Room of the Employee Benefits Security Administration.

2.  Obtain copies of all Plan documents governing the operation of the Plan, including the latest annual report (Form 5500 series)(when available), updated summary plan descriptions, and other information upon written request to Abbott. Abbott may make a reasonable charge for the copies.

3.  Receive a summary of the Plan's annual financial report when available. The Company is required by law to furnish each member with a copy of this summary annual report.

Very truly yours,

James F. Coppens

cc: Mike Meyer

**Abbott**
A Promise for Life

**STEVEN PAUL COHN**
ADVOCACY CENTER FOR EMPLOYMENT LAW
2084 Alameda Way
San Jose, California 95126
(408) 557-0300
Fax: (408) 557-0309

September 26, 2006


Plan Administrator/Sr. Vice President of Human Resources
Abbott Laboratories
100 Abbott Park Road
Abbott Park, IL 60064

**Re:    Mark Murray**

Dear Plan Administrator:

This office represents Mark Murray with respect to severance issues addressed in James F.
Coppens' correspondence to Mr. Murray of August 11, 2006.  Please consider this Mr. Murray's
appeal and reply to the company's position, directing further response to this office.

Mr. Murray has raised claims under the 2004 and 2006 Plans addressed in the August 11, 2006
correspondence.  It is our understanding that Abbott has declined severance benefits on the basis
that it has offered Mr. Murray "comparable" employment as a Vice President of Finance post-
Close of the Guidant-Abbott merger.  There are a number of misstatements of material fact upon
which Abbott relies in its position denying enhanced severance.  As discussed below, the true
facts are that the offer of continuing or reemployment was at a substantially reduced position,
which is not comparable to Mr. Murray's former executive level at Guidant.  This will be
addressed below.

The company incorrectly states that Mr. Murray was Vice President (VP), Finance for Vascular
Intervention (VI) until approximately August, 2004.  Mr. Murray, in fact, held the following
positions with Guidant VI prior to August, 2004:

| | |
|---|---|
| December 1994-July 1998 | VP of Finance and Information Systems |
| July 1998-March 2002 | VP of Finance, Information Systems and Business Development |
| March 2002-August 2004 | VP of Finance and Business Development |

From August 2004 until the Close on April 21, 2006, Mr. Murray was the VP of Finance for
Guidant VI, Cardiac Surgery (CS), and Endovascular Solutions (ES), reporting to Keith Brauer,
VP of Finance and Chief Financial Officer of Guidant.  At no time had Mr. Murray served solely
as the VP of Finance for Guidant VI.

Following Guidant's acquisition, Mr. Murray never received a formal positional offer, however,
was given the proposed organization chart and discussed the position on or about April 17, 2006

**AR 21**

Plan Administrator
September 26, 2006
Page 2

with Chris Turek, VP, Finance at Abbott, John Capek, President VI (Cardiac Therapies), and Bob
Boehn, VP Human Resources, VI (Cardiac Therapies). The position offered, however, was
dissimilar in substantial respects to Mr. Murray's former position at Guidant and was a junior
position that he had not been at for approximately 17 years. This position had less scope,
visibility and responsibilities, and reported to a manager one level lower than Mr. Murray had
enjoyed at Guidant, where he had been the VP of Finance for three of Guidant's four business
units; VI, CS and ES. Of these three business units, one went to Boston Scientific (CS), and two
went to Abbott (VI and ES), with only one of these (VI) to be supported by Mr. Murray. The ES
business was acquired by Abbott and placed under an existing Abbott executive and in doing so,
the financial responsibilities were placed with an Abbott Controller.

Mr. Murray makes his claims under the 2004 and 2006 Guidant Plans as a terminating employee
at Close. Mr. Murray's position was in fact terminated, while he was offered a substantially,
materially reduced role over one remaining unit of the three units he previously had financial
directive over within Guidant.

A review of the specific duties previously within the scope of Mr. Murray's Guidant VP duties
reveals that these were to be significantly reduced as contemplated by Abbott's proposal. Mr.
Murray's pre-Close duties contained multiple functions besides Finance and included duties well
beyond the scope of "managerial analysis and financial performance, measurement and
planning." Mr. Murray assumed the role of VP of Finance for VI, CS and ES in August, 2004,
which included a VP reporting directly to Mr. Murray, as well as a substantial merit increase. In
the role of VP, Finance for VI, CS and ES, Mr. Murray's responsibilities included the following:

- Member of each business units' top leadership team (all of whom were VPs);
- Member of Guidant's CFO staff reporting directly to the CFO;
- An officer of several Guidant legal entities (e.g. Advanced Cardiovascular
  Systems, Endovascular Therapies, Guidant Investment Corp., and several others);
- Total combined revenues in excess of $1.3 billion;
- Financial Reporting, Financial Planning, Manufacturing Analysis and Cost
  accounting;
- Pricing, sales reporting and analysis for CS and ES;
- Guidant's U.S. Credit and Collections, Rebates and GPOs;
- Member of Guidant's Treasury Oversight Committee;
- Sarbanes Oxley compliance, including certification of 10Ks and 10Qs;
- U.S. sales and use tax planning and compliance;
- U.S. and State income tax for each of the three business units;
- Direct responsibility for approximately 85 individuals; and
- Corporate recruiting.

As referenced above, Mr. Murray was a VP for Guidant for its entire history and at all times his

AR 22

Plan Administrator
September 26, 2006
Page 3

VP responsibilities included other functions besides Finance (e.g., Information Systems and Business Development) or responsibility over other business units. The role proposed to Mr. Murray by Abbott was titled "VP Controller VI," reporting directly to John Chapek, President of the VI business unit and a dotted line to Chris Turek, Abbott VP of Finance. In this role, Mr. Murray would have responsibilities for only Finance and VI, a significant reduction in Mr. Murray's role and scope of responsibility. The new position's specific responsibilities include the following:

- Member of only VI top leadership team;
- Dotted line reporting to an Abbott VP of Finance rather than to Abbott's CFO;
- A revenue base of 70% less than Mr. Murray's prior revenue base responsibilities;
- Financial Reporting, Financial Planning, Manufacturing Analysis and Cost accounting (VI only);
- Direct responsibility for approximately 47 individuals (after tax and shared service responsibility change, discussed below).

Incident to the new role, Guidant's U.S. Credit and Collections, Rebates and GPOs would be migrated to Abbott shared services; sales and use tax planning and compliance would be immediately moved to Abbot Tax; and U.S. and State income tax would be moved immediately to Abbott Tax. These are responsibilities which previously belonged to Mr. Murray.

In the proposed Abbott Vascular finance organization, a Controller reports to a divisional President, a Finance manager reports to a divisional President, and a Finance Director reports to a divisional President. Accordingly, Mr. Murray is placed, irrespective of the "VP Controller VI" title, at a reporting level parallel to a Controller, Finance Manager, and a Finance Director.

After Mr. Murray resigned due to the substantially and materially reduced role, Abbott Vascular did not fill the proposed role and instead appointed two controllers and two directors, who each supported a respective divisional President. This organization was in place until an announcement on August 10, 2006, whereby Abbott named a new VP of Finance and Controller with substantially more responsibilities than offered to Mr. Murray. In fact, the role that was offered to Mr. Murray is virtually the same position now held by Linda Raggi, Controller, Cardiac Therapies (VI), who reports to John Capek and the Abbott Vascular VP of Finance. This underscores the fact that Mr. Murray was in an essentially demoted position and placed at a Controller/Director peer level.

It should also be noted that Mr. Murray was never informed that his grade level remained unchanged. It is substantially relevant that no emails or other correspondence were provided delineating that the compensation package was to remain unchanged, even after presentation of the organizational chart and Mr. Murray's expression of concern over his reduced role. It is also particularly noteworthy that Guidant never produced any job description, offer letter, nor made

09/26/2006  15:01    4085570309                ADVOCACY CENTER                                    PAGE  05/05

Plan Administrator
September 26, 2006
Page 4

any endeavor to clarify to Mr. Murray that he was indeed being retained in his identical and a continuing role as he had enjoyed within the Guidant organization.

Request is hereby made that we be provided any and all writings, as defined by California Evidence Code Section 250, which reflect or were relied upon by Abbott in its decision denying benefits, including but not limited to any writings upon which Abbott relies or has considered in determining that a "functionally equivalent" position to Mr. Murray's role pre-Close was offered to him.

Mr. Murray reserves the right to amend this appeal to include documents in the possession of Abbott, made available by Abbott, or produced by Abbott in connection with the above request.

Please clarify any basis that you claim that Mr. Murray is not entitled severance under both the 2004 and 2006 severance Plans.

Thank you for your courtesy and attention.

Yours very truly,

STEVEN P. COHN, ESQ.
SPC/sb
pc: James Coppens, Divisional Vice President, Benefits

**AR 24**



James F. Coppens
Divisional Vice President, Benefits          Ph: 847.938.8320
Dept. 589 Bldg. AP51-2                       Fax: 866.390.9362
200 Abbott Park Road
Abbott Park, IL 60064-6222

*BCC: Max Bonn*

November 28, 2006

Mr. Steven P. Cohn, Esq.
Advocacy Center for Employment Law
2084 Alameda Way
San Jose, CA 95126

Dear Mr. Cohn:

We are in receipt of your appeal request dated September 26, 2006 in which you request a review of our adverse benefit determination dated July 21, 2006 regarding your claim for severance benefits under the Abbott Severance Pay Plan for Former U.S. Guidant Employees, 2006 Edition (the "Plan") made on behalf of your client, Mark Murray. Due to business exigencies arising from Abbott's recent acquisition of Kos Pharmaceuticals, the process of reviewing appeals has been delayed. In order to permit a thorough review of your appeal and full consideration of the additional information provided therein and to determine what documents, if any, are responsive to the request made in your appeal, we are extending the time for rendering a decision on your appeal for 25 days in accordance with Section 6 of the Plan. Accordingly, will provide you with a final decision on your appeal no later than December 19, 2006. If we determine that there are documents responsive to the request in your appeal, you will be given additional time in which to supplement your appeal before Abbott renders a final determination on your appeal. If you have any questions regarding this extension notice, feel free to contact me at your convenience.

Sincerely,

*James Coppens*

James F. Coppens

cc: Mark Murray



**AR 25**



Abbott

James F. Coppens                    Ph: 847.938.8320
Divisional Vice President, Benefits    F: 847.935.4343
Dept. 589  Bldg. AP51-2
200 Abbott Park Road
Abbott Park, IL  60064-6222

December 19, 2006

Mr. Steven P. Cohn, Esq.
Advocacy Center for Employment Law
2084 Alameda Way
San Jose, CA 95126

Dear Mr. Cohn,

As noted in our correspondence of November 28, 2006, we are in receipt of your appeal request dated September 26, 2006 (the "Appeal") in which you request a review of our adverse benefit determination dated August 11, 2006 regarding your claim for severance benefits under the Abbott Severance Pay Plan for Former U.S. Guidant Employees, 2006 Edition (the "Plan") made on behalf of your client, Mark Murray.  In the Appeal, you requested certain additional information in regard to Mr. Murray's claim.  Specifically, you requested "any and all writings, as defined by California Evidence Code Section 250, which reflect or were relied upon by Abbott in its decision denying benefits, including but not limited to any writings upon which Abbott relies or has considered in determining that a 'functionally equivalent' position to Mr. Murray's role pre-Close was offered to him."

In response to your request, enclosed are the following:

1.      A copy of the Plan document;

2.      Copies of emails by and between Abbott employees charged with rendering advice to James Coppens, the individual charged with making initial benefit determinations under the Plan; and

3.      A copy of notes prepared by Maxine Bonn regarding discussions of Mr. Murray's claim under the Plan.

As noted previously in our letter dated November 28, 2006, you are hereby granted an additional 60 days from the date of this letter in which to submit additional information or amend or supplement the Appeal.  Upon receipt of your revised Appeal, if any, we will render a decision within 30 days thereafter.  Please let us know as soon as possible if you will need this additional time.  If you do not inform us as to whether you need this additional time, we will render a decision on the Appeal as filed by February 18, 2007.

Sincerely,

James Coppens

/cc:/ Mark Murray

Abbott
A Promise for Life

AR 26



"Boehm, Bob [SC]\(ES\)"
<bboehm@guidant.com>
07/31/2006 02:23 PM

To    "Diez-Canseco, Carla \(SC\)" <ccanseco(
      "Cushman, Elizabeth \(SC\)" <ecushman-
      "Bonn, Maxine G \(ABT\)" <maxine.bonn

cc

bcc

Subject    RE: Murray information request

Answers to the questions..

Carla: Thanks for your help with this ..

---

From:    Diez-Canseco, Carla (SC)
Sent:    Monday, July 31, 2006 12:15 PM
To:      Boehm, Bob [SC](ES)
Subject:    RE: Murray information request

Answers are below in blue.

Thank you.

**Carla P. Diez-Canseco**
Director, Human Resources
Abbott Vascular
3200 Lakeside Drive
Santa Clara, CA 95054-2807, USA
Tel 408.845.2209
Fax 408.845.1899
ccanseco@guidant.com
www.guidant.com

*ATTENTION:*
*The information contained in this message, including any attachment(s),*
*may be legally privileged and confidential. It is intended to be read only*
*by the individual or entity to whom it is addressed or by their designee. If*
*the reader of this message is not the intended recipient, you are on*
*notice that any distribution of this message, in any form, is strictly*
*prohibited.*

*If you have received this message in error, please immediately notify the*
*sender and delete or destroy any copy of this message.*

**AR 27**

**From:** Boehm, Bob [SC](ES)
**Sent:** Friday, July 28, 2006 2:55 PM
**To:** Diez-Canseco, Carla (SC)
**Subject:** FW: Murray Information request

Do you have this info??

**From:** Cushman, Elizabeth (SC)
**Sent:** Wednesday, July 26, 2006 2:25 PM
**To:** Boehm, Bob [SC](ES)
**Cc:** Bonn, Maxine G (ABT)
**Subject:** Murray information request

Bob - Can you get Max and I answers to these questions?

- What was Mark Murray's exact title pre 4/21/06?   Vice President, Finance
- Was he going to retain that same title if he accepted the new role? Yes

- What was his grade (EX__)? I know his level was VP. Grade EX 8
- Would he have retained that same grade and level if he accepted the new role?  I believe the answer is yes. Yes, at least if and until we migrated to the Abbott compensation and salary administration, at which time all Guidant legacy employees would transition as well .

Thanks, and please reply to Max as well.

Elizabeth Cushman
Senior Counsel
Abbott Vascular
3200 Lakeside Drive
Santa Clara, CA  95054
Tel 408.845.3153
Fax 408.845.2319
www.abbott.com



**Judith A**
**Priebe/LAKE/CORP/ABBOTT**
07/27/2006 05:31 PM

To  Dana D Deane/LAKE/CORP/ABBOTT@/

cc  "Bob Boehm" <bboehm@guidant.com>, '
<ecushman@guidant.com>, John A
Berry/LAKE/CORP/ABBOTT@ABBOTT,

bcc

Subject  Re: Proposed letter to Mark Murray 🗎

Dana:

He was offered 7,000 restricted stock units (no options), plus the cash
payout.  I can give you that amount if you need it.

- Judy

| Judith A Priebe | Abbott | Ofc: 847-937-6128 |
|---|---|---|
| Director | 200 Abbott Park Road | Cell: 847-421-3625 |
| Corporate Employee Relations | Dept: 069M, Bldg AM/J37 | Fax: 847-937-8631 |
| | Abbott Park, IL 60064 | judy.priebe@abbott.com |

This communication may contain information that is proprietary, confidential, or exempt from disclosure.  If you are not the intend
other dissemination, distribution, use or copying of this communication is strictly prohibited.  Anyone who receives this message i
immediately by telephone or by return e-mail and delete it from his or her computer.

Dana D Deane/LAKE/CORP/ABBOTT



**Dana D**
**Deane/LAKE/C**
**ORP/ABBOTT**
07/27/2006
03:43 PM

To  Mike L Meyer/LAKE/MPG/ABBOTT@ABBOTT

cc  "Bob Boehm" <bboehm@guidant.com>, "Liz Cushman"
<ecushman@guidant.com>, John A
Berry/LAKE/CORP/ABBOTT@ABBOTT, Judith A
Priebe/LAKE/CORP/ABBOTT@ABBOTT, Maxine G
Bonn/LAKE/CORP/ABBOTT@ABBOTT

Subject  Re: Proposed letter to Mark Murray 🗎

Other than confirming factual accuracy, I think the letter is fine.

Judy:  Would you be the right person to help of the terms for retention?

And Bob re title, grade and duties?

| Dana D Deane | Abbott Laboratories | phone +1 847-937-2472 |
|---|---|---|
| Division Counsel | 100 Abbott Park Rd | fax +1 847-937-1327 |
| Litigation Department | Abbott Park, IL 60064-6008 | Dana.Deane@abbott.com |
| Dept 33C; Bldg AP6A-1 | USA | |

This communication may contain information that is proprietary, confidential, or exempt from disclosure.  If you are not the intend
other dissemination, distribution, use or copying of this communication is strictly prohibited.  Anyone who receives this message i
immediately by telephone or by return e-mail and delete it from his or her computer.

Mike L Meyer/LAKE/CORP/ABBOTT



Mike L
Meyer/LAKE/C
ORP/ABBOTT

07/27/2006
02:41 PM

To   Maxine G Bonn/LAKE/CORP/ABBOTT@ABBOTT, "Bob
Boehm" <bboehm@guidant.com>, "Liz Cushman"
<ecushman@guidant.com>, Dana D
Deane/LAKE/CORP/ABBOTT, Judith A
Priebe/LAKE/CORP/ABBOTT

cc   John A Berry/LAKE/CORP/ABBOTT

Subject   Re: Proposed letter to Mark Murray


Bob,

Can you please make sure the factual content is accurate?  I can fill in
some of the blanks on the retention package when I return tomorrow.

Thanks Max for "taking the plunge".
---------------------------------
Sent from my BlackBerry Wireless Handheld
   Maxine G Bonn

   From: Maxine G Bonn
   Sent: 07/27/2006 11:21 AM
   To: bboehm@guidant.com; ecushman@guidant.com; Dana Deane;
Mike Meyer; Judith Priebe
   Cc: John Berry
   Subject: Proposed letter to Mark Murray

   All:

   Attached is a proposed letter to Mark Murray for Jim Coppens' eventual
   review.  Jim is in charge of claims administration for the Abbott
   Severance Pay Plan for Former US Guidant Employees. 2006 Edition.

   Please review carefully the "Facts," section and fill in blanks, if possible.
   Liz was kind enough to share what facts she knew, and I made
   assumptions as best I could.




Maxine G. Bonn
Division Counsel, Abbott Laboratories Legal Division
Dept. 032L/Bldg. AP6A-2, 100 Abbott Park Road, Abbott Par
Phone 847-935-7535/Fax 847-938-9492

The information contained in this communication is confidential, may be subject to legal
privileges, may constitute inside information, and is intended only for the use of the addressee

 "Cushman, Elizabeth \(SC\)"
&lt;ecushman@guidant.com&gt;
07/26/2006 04:25 PM

To    "Boehm, Bob [SC]\(ES\)" &lt;bboehm@guic

cc    "Bonn, Maxine G \(ABT\)" &lt;maxine.bonn{

bcc

Subject    Murray information request

Bob - Can you get Max and I answers to these questions?

 - What was Mark Murray's exact title pre 4/21/06?
 - Was he going to retain that same title if he accepted the new role?
 - What was his grade (EX__)?  I know his level was VP.
 - Would he have retained that same grade and level if he accepted the new role?  I believe the answer is yes.

Thanks, and please reply to Max as well.

Elizabeth Cushman
Senior Counsel
Abbott Vascular
3200 Lakeside Drive
Santa Clara, CA  95054
Tel 408.845.3153
Fax 408.845.2319
www.abbott.com

**AR 31**

Q Mark Murray ①

was VP of finance
west coast position
3 west coast
V1
ES
CS

He was VP of finance for
V1. layoff in 2004.
we consolidated all
west coast. June 8/04,
he was VP of finance
for V1, ES + CS (cardiac
surgery)
reported to Brauer CFO of
Keith        Whole company

ABT offered MM
"VP of Finance" for
CT (VI)
Cardiac therapies

②

reporting to Caplek
who is president
of CT, To him,
going back to pre
August 2004

Finance is Same
functional area
"functionally
equivalent"?

His job was eliminated
    CS → BS
    ES → Chip Hance
    UI → became CT

3

His job was eleminated

Salary same
Comp oppy
same
Same functional
area,
matter not of breath
but skill set. Function

is the same We're
not making our
marketing. the
Level
Functional area
Comp opportunity.
Substantially similar
job responsibilities

④

Scope may be
different. We
don't want to
includ level

like Ex-7
level — Vice
President



01/30/2007  14:13    4085570309    ADVOCACY CENTER    PAGE  02/15

# STEVEN PAUL COHN
**ADVOCACY CENTER FOR EMPLOYMENT LAW**
2084 Alameda Way
San Jose, California 95126
(408) 557-0300
Fax: (408) 557-0309

January 30, 2007

**VIA FACSIMILE**
James F. Coppens
Divisional Vice President, Benefits
Abbott Laboratories
Dept.589 Bldg. AP51-2
200 Abbott Park Road
Abbott Park, IL 60064-6222

Re:    **Mark Murray/Abbott Labs**

Dear Mr. Coppens:

Thank you for your correspondence of December 19th with enclosed documentation. We will take this opportunity to review the content of core materials in Abbott's document production of December 19th as they pertain to Mr. Murray's position in this matter.

We first note that Abbott's initial position was that Mr. Murray's position had not been "eliminated" and, alternately, that he had been offered a "substantially equivalent" new position. Please refer to the four pages of notes prepared by Maxine Bonn, Division Counsel, Abbott Laboratories Legal Division. Presumably, preparing these was part of her investigation and corporate response to Mr. Murray's claim for benefits under Abbott Severance Pay Plan for Former U.S. Guidant "Employees, 2006 Edition (the "2006 Plan"). It is important to note that these are not comments by Mr. Murray, as he was not interviewed by Ms. Bonn.

On the first page of attorney Bonn's notes is the reference: "He was VP of Finance for VI.." As referenced in our original appeal letter dated September 26, 2006, Mr. Murray was never just the VP of Finance for VI and, in fact, his positions have always been substantially greater. At the bottom of the first page of notes and continuing on to the second page of notes are references that "ABT offered MM [Mr. Murray] VP of Finance for CT (VI) reporting to Capek who is president of CT, to him going back to pre-August 2004." It should be noted that, from March, 2003 through August, 2004, Mr. Murray was the Vice President of Finance and Business Development for Guidant Vascular Intervention and reported to Mr. Dana Mead, President Guidant Vascular Intervention.

Continuing on the second page of attorney Bonn's notes is the reference "his job was eliminated," referring to Mr. Murray's layoff as Vice President of Finance for Guidant Vascular Intervention, Cardiac Surgery and Endovascular Solutions, reporting to Keith Brauer, VP of Finance and Chief Financial Officer of Guidant. The reference indicates that CS (Cardiac

**AR 36**

James Coppens
January 30, 2007
Page 2

Surgery) was absorbed into BS (Boston Scientific); Endovascular Surgery went to a different Abbott leader, Chip Hance, and Vascular Intervention (VI) became CT (Cardiac Therapies) inside of Abbott. The reference to position elimination is again repeated at the top of page three, consistent with Mr. Murray's position in this appeal.

Thereafter follows an analysis of position equivalency in which attorney Bonn notes "salary same," "comp opportunity same," and "same functional area." What appears to follow is an entry stating "matter not of breadth but skill set," and that the "function is the same [the company is] not making [Mr. Murray] marketing." There is also an entry of "substantially similar job responsibilities." Of interest, at no time did the company attorney interview Mr. Murray as to his specific understanding of substantial dissimilarities at ground-level for the position. Please refer to our appeal letter of September 26, 2007 regarding specifics of dissimilarities. Indeed, at page four, attorney Bonn notes "Scope may be different. We don't want to include level like EX 7-level-Vice President."

In fact, the scope is substantially different. Notably absent from the company's review is any study of the traditional Vice President scope of duties at Abbott. We previously highlighted the company's erroneous representation that Mr. Murray had, two years back, been a Vice President of Finance for Vascular Intervention. In fact, Mr. Murray's role was substantially greater in that he served as Vice President of Finance for Business Development in addition to Vascular Intervention.

Also notably absent from the packet is attorney Bonn's review of organizational documents, including organization charts to demonstrate that Mr. Murray would be functioning at a substantially different level, as earlier raised in Mr. Murray's appeal. We have attached as Exhibit A the four-page hand-written notes of attorney Bonn for easy reference.

Attached hereto as Exhibit B is a proposed organization chart for Mr. Murray's "offered" position, in which Mr. Murray is listed at the same reporting level as a Controller, a Finance Manager, and a Finance Director. His title is also VP "Controller," a title that Mr. Murray has not had in the past seventeen years of his career. Indeed, following Mr. Murray's employment termination, Mr. Murray's proposed position was, in fact, replaced with a Controller/Cardiac Therapies, with Linda Raggi holding that position. The Finance organizational chart in place after Mr. Murray's employment termination is attached hereto as Exhibit C.

The company, in August, 2006, created a position of Vice President of Finance held by Rich Scarpelli, formally Controller AVD, ES, who has now been made Vice President of Finance over the entire Abbott Vascular finance organization. Attached hereto as Exhibit D is the organizational announcement dated August 10, 2006.

Mr. Murray's appeal contains substantial facts demonstrating that a lowered position was offered

01/30/2007  14:13    4885570309    ADVOCACY CENTER    PAGE  04/15

James Coppens
January 30, 2007
Page 3

by way of authority, reporting, corporate impact and visibility.  It is apparent that Mr. Murray's job was in fact eliminated, contrary to Abbott's initial position in the case.  Mr. Murray therefore has a qualifying event for the severance benefit under appeal.  The issue then becomes whether a substantially equivalent job was offered.  The internal documents produced coupled with the facts presented by Mr. Murray demonstrate that the job offered Mr. Murray was not substantially equivalent, but was a substantially and materially reduced role. Specifically:

- Mr. Murray has never been solely the VP of Finance for Guidant VI; rather, his VP roles have always been broader, including additional functions or business units;
- The position offered Mr. Murray is junior to any position that Mr. Murray has held during the last 17 years;
- The position offered was substantially less in scope, visibility and responsibilities as detailed in our letter of September 26, 2006.  In fact, this was noted on Mr. Murray's termination exit paperwork dated May 11, 2006;
- The position offered was placed, irrespective of the "VP controller VI" title, at a reporting level parallel to a Controller, Finance Manager and a Finance Director;
- After Mr. Murray's resignation, the position offered him was never filled.  In fact, the finance position reporting to John Capek after Mr. Murray's resignation was titled Controller; and
- On August 10, 2006, Abbott named a new VP of Finance and Controller for Abbott Vascular, a position with substantially more responsibilities than the position offered to Mr. Murray.

Please be advised that, based on the company's lack of documentation and based on those documents produced, we view Abbott's current position as a violation of Mr. Murray's ERISA rights and we will be presenting a claim for attorney's fees at the conclusion of the appeal process, which fees are currently modest. We look forward to your prompt response and, if there is no additional documentation forthcoming from Abbott, then Mr. Murray is submitting the matter for exhaustion of his internal grievance.

Thank you for your attention and courtesy.

Yours very truly,

STEVEN P. COHN, ESQ.
SPC/sb
Enclosures
pc: client

01/30/2007  14:13    4085570309                    ADVOCACY CENTER                         PAGE  05/15

EXHIBIT A

①

Mark Murray

was  VP of finance
          west coast position
3 west coast
          VI
          CS
          CS

He was VP of finance for
VI. laying in 2004.
we consolidated all
west coast   since 8/04,
he was VP of finance
   for VI, CS + CS (Cardiac
   Surgery)
reported to Brauer CFO of
   Keith          Whole company

ABT offered MM
   a "VP of Finance" for
CT (VI)
Cardiac therapies

**AR 40**

②

reporting to Caplik
who is president
of CT, To him,
going back to pre
August 2004

Finance is same
functional area
"functionally
equivalent"

His job was eliminated
CS → BS
ES → Clip Hance
U1 → became CT

**AR 41**

3

His job was eliminated

Salary same
Comp oppy
same
Same functional
area,
matter not of breath
but skill set. Function

is the same were
not making him
marketing. too
Level
Functional area
— Comp opportunity.
substantially similar
job responsibilities

ADVOCACY CENTER    PAGE 09/15

④

Scope may be different. We don't want to include level like EX-7

level — Vice President



H17/30/2007  14:13   4885578389                ADVOCACY CENTER                    PAGE  10/15

EXHIBIT B

AR 44

01/30/2007  14:13    4085578309                    ADVOCACY CENTER                    PAGE  11/15



01/30/2007  14:13     4085570309                 ADVOCACY CENTER                         PAGE  12/15

# EXHIBIT C

01/30/2007  14:13    4865578389    ADVOCACY CENTER    PAGE  13/15



# Proposed Cardiac Therapies and Vascular Solutions Finance Organization – Day One

**(TAB 2)**
President Cardiac Therapies
J. Capek

Controller Cardiac Therapies
L. Raggi

**(TAB 3)**
President Vascular Solutions
C. Hance

Controller Vascular Solutions
R. Scarpelli

Controller ES
G. Hu

**(TAB 4)**
President U.S. Cardiovascular
K. Rhatigan

Finance Director
U.S. Commercial Ops
S. Bartels

**(TAB 5)**
President Intl. Cardiovascular
N. Spaulding

Finance Director
International Ops
D. Pittoors

Guidant Acquisition

1

Abbott
A Promise for Life

**AR 47**

# EXHIBIT D

01/30/2007  14:13    4085570309                 ADVOCACY CENTER                 PAGE  15/15

Thought you would find this interesting.

## Mark Murray

**From:**    Kinsey, Christina (SC) [ckinsey@guidant.com]
**Sent:**    Thursday, August 10, 2006 4:31 PM
**To:**      mamurray1@comcast.net
**Subject:** Thought you would find this interesting.

**Here's the latest org announcements:**
August 10, 2006

We are pleased to announce that Rich Scarpelli has been named Divisional Vice President and Controller for Abbott Vascular, effective immediately. Rich will have a dual reporting relationship to John Capek, President, Cardiac Therapies and Chip Hance, President, Vascular Solutions.

Reporting to Rich are:

- Steve Hofer, Assistant Controller
- Monica Pool, Manager, U.S. Operations and Global R&D
- Shari Blanco, Office Manager

Functionally reporting to Rich are:

- Linda Raggl, Controller, Cardiac Therapies
- Grace Hu, Controller, Vascular Solutions
- Scott Bartels, Director, U.S. Commercial Operations
- Danny Pittoors, Director, International Operations
- Chris Hinrichs, Controller, Europe Manufacturing Operations

Linda, Grace, Scott and Danny will continue their direct reporting relationships to the current four AV presidents. Rich has held several progressive financial positions both internationally and domestically. He obtained his bachelor's degree in accountancy from the University of Illinois and is a Certified Public Accountant.

Please join us in congratulating Rich on his new assignment.

John M. Capek, Ph.D.
President, Cardiac Therapies    Chip Hance
President, Vascular Solutions

8/23/2006

**AR 49**

Stephen R. Fussell
Senior Vice President,
Human Resources

Abbott
Dept. 396, bldg. AP6D
100 Abbott Park Road
Abbott Park, IL 60064-6020

Tel: (847) 935-4878
Fax: (847) 937-3966
stephen.fussell@abbott.com

bcc:  M. G. Bonn

March 19, 2007

Mr. Steven P. Cohn, Esq.
Advocacy Center for Employment Law
2084 Alameda Way
San Jose, CA 95126

Dear Mr. Cohn,

This letter is in response to your letter dated January 30, 2007 (the "Appeal Supplement"), in which you supplemented your appeal letter dated September 26, 2006 (the "Appeal Letter") appealing Abbott Laboratories' ("Abbott") denial of Mark Murray's claim for severance benefits under the Abbott Severance Pay Plan for Former U.S. Guidant Employees, 2006 Edition (the "Plan"). As noted in the Appeal Letter, the Appeal Letter was an appeal of Abbott's adverse benefit determination dated August 11, 2006 (the "Initial Determination") made with respect to the claim originally made in your letter dated May 11, 2006.

The Plan was created by Abbott after the consummation of Abbott's purchase of certain assets of Guidant Corporation (the "Close"). Under the Plan, James Coppens is charged with making initial benefits determinations under the Plan. I am charged with reviewing appeals from adverse benefit determinations under the Plan and rendering a decision on appeal.

In the Appeal Letter, as supplemented by the Appeal Supplement, you reassert your claim that because the duties that would be assigned to Mr. Murray in connection with Abbott's post-Close operations did not exactly match up with the pre-Close duties associated with his position at Guidant Corporation that this was a job elimination for purposes of the Plan. In the Appeal Supplement, you offer possible interpretations of, and conclusions based on, handwritten notes of our counsel. We disagree with your interpretation of the Plan and the written materials provided to you in response to your information request.

**AR 50**

Mr. Steven P. Cohn, Esq.
March 19, 2007
Page Two

As permitted by the Employee Retirement Income Security Act of 1974 ("ERISA") and as required by Section 5 of the Plan, the Plan administrator (and his authorized delegates) ultimately must interpret the provisions of the Plan. Accordingly, we interpret a job elimination for purposes of the Plan to involve situations where business exigencies require downsizing or the complete elimination of a position due to functional redundancies within the Abbott organization (e.g., a termination of an existing line of business or an employer-initiated termination of completely duplicative employment positions as a result of a corporate acquisition).

We do not interpret the Plan to provide for benefits where a person's employment is continued in a modified form to in order to fit within the Abbott business model, as is the case here. The finance function intended for Mr. Murray continues to be an element of the Abbott post-Close business model. While Mr. Murray's role in that finance function may have been modified to fit within the Abbott business model, it was certainly not eliminated. Abbott's inability to provide Mr. Murray with a position that replicated each and every one of his pre-Close duties with Guidant is not a job elimination contemplated by the Plan.

In your Appeal Supplement, you assert that the handwritten notes constitute evidence that Abbott had determined that Mr. Murray's position was being eliminated. While the notes you cite were part of the information gathering process, the duty of plan interpretation and decision making falls to the Plan administrator and his delegates.

Moreoever, Section 4.b. of the Plan provides that no severance or other benefits are payable under the Plan in situations where Abbott gives notice to an employee that his position is being eliminated, but offers the employee a functionally equivalent position that does not require relocation. In the Appeal Letter and the Appeal Supplement, you set forth facts that you believe require Abbott to determine that Mr. Murray's post-Close position with Abbott was not functionally equivalent to the position he occupied with Guidant Corporation. However, under the Plan, functional equivalence is determined by Abbott, in its sole discretion.

As you note in the Appeal Letter, Mr. Murray voluntarily resigned from employment because he felt the revised position with Abbott constituted a demotion. As you know, the Plan does not provide for benefits upon an employee-initiated voluntary resignation. In effect, Mr. Murray did not care to continue in his revised role and decided to terminate his employment. By its explicit terms, this is not a qualifying termination of employment under the Plan.

Mr. Steven P. Cohn, Esq.
March 19, 2007
Page Three

Our interpretation of functional equivalence for purposes of the Plan does not require exact equivalence. Indeed, exact equivalence would be impossible in almost every corporate transaction. Furthermore, if exact equivalence had been intended, the Plan would have so stated and there would have been no need for the Plan to reserve the broad discretion to determine functional equivalence as set forth in Section 4.b. of the Plan. As we interpret the Plan, the relevant equivalence is based on general function rather than specific duties.

We view the finance position offered to Mr. Murray operations as functionally equivalent within the Abbot business model, notwithstanding the fact that the position under the Abbott business model does not entail the exact same duties Mr. Murray had with Guidant Corporation prior to Close. Mr. Murray's compensation was not being decreased, and he was not being asked to perform duties outside his financial management skill set. Thus, even if we concluded that Abbott had given Mr. Murray notice that his job was being eliminated (which we do not believe to be the case), we believe that he was offered the opportunity to continue employment in a functionally equivalent position. This determination is squarely in line with the broad discretionary powers granted under the Plan.

In the Appeal Letter, you appear to assert claims for benefits under both the Plan and the Guidant Severance Pay Plan, 2004 Edition (the "Guidant Plan"). We note that, unlike the Guidant Corporation Change in Control Severance Pay Plan for Employees and the Guidant Corporation Change in Control Severance Pay Plan for Select Employees, Abbott did not assume the Guidant Plan in connection with its purchase of Guidant Corporation assets and is no way liable for claims made under the Guidant Plan. Accordingly, Abbott cannot grant or deny benefits under the Guidant Plan. Any claim for benefits under the Guidant Plan should be made to Guidant Corporation, or its successor in interest. Similarly, how Guidant Corporation may or may not have interpreted functional equivalence under the Guidant Plan has no bearing on the interpretation the Plan administrator is called to make under the Plan.

In accordance with the Plan provisions described above and the discretionary power granted to Abbott and the Plan administrator under Section 5 of the Plan, it is our determination that Mr. Murray is not entitled to any benefits under the Plan.

**AR 52**

Mr. Steven P. Cohn, Esq.
March 19, 2007
Page Four


Based on the foregoing, you should consider this to be an adverse benefit deter-
mination on review as to your claim for severance benefits under the Plan in
accordance with Section 6 of the Plan and Section 503 of ERISA. You or your
authorized representative, have the right to:

    1.  receive, upon request and free of charge, reasonable access to,
        and copies of all documents, records and other information
        relevant to the claim;

    2.  and obtain further information regarding voluntary appeal
        procedures, if any, under the Plan; and

    3.  bring an action under Section 502(a) of ERISA.

Sincerely,

SRF:smt

**AR 53**

1

## CERTIFICATE OF SERVICE

2

     The undersigned, one of the attorneys for Defendant The Abbott Severance Pay Plan For

3

Former U.S. Guidant Employees, 2006 Edition, hereby certifies that on July 31, 2008, a true and

correct copy of the foregoing ADMINISTRATIVE RECORD was filed electronically with the

4

Court. Notice of this filing will be sent to the following parties by operation of the Court's

electronic filing system. Parties may access this filing through the Court's system.

5

6

                /s/ Joseph J. Torres

7

                Joseph J. Torres

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28