Joseph J. Torres (Admitted *Pro Hac Vice*)   Robert Spagat (SBN: 157388)
Sheila P. Frederick (Admitted *Pro Hac Vice*)   Allison M. Dibley (SBN: 213104)
WINSTON & STRAWN LLP   WINSTON & STRAWN LLP
35 West Wacker Drive   101 California Street
Chicago, Illinois  60601   San Francisco, California  94111-5894
Telephone:   312-558-5600   Telephone:   415-591-1000
Facsimile:   312-558-5700   Facsimile:   415-591-1400
Email: jtorres@winston.com   Email: rspagat@winston.com
       sfrederick@winston.com          adibley@winston.com

Attorneys for Defendant
THE ABBOTT SEVERANCE PAY PLAN
FOR FORMER U.S. GUIDANT
EMPLOYEES, 2006 EDITION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARK MURRAY,<br><br>       Plaintiff,<br><br>   v.<br><br>THE ABBOTT SEVERANCE PAY PLAN FOR FORMER U.S. GUIDANT EMPLOYEES, 2006 EDITION,<br><br>       Defendant. | CASE NO.:  C 08-00906 JW<br><br>**JOINT STATEMENT OF UNDISPUTED FACTS** |

Pursuant to Civil Local Rule 56-2 of the United States District Court for the Northern District of California and this Court's Scheduling Order entered May 29, 2008, the Parties submit the following Joint Background and Undisputed Statement of Facts.  All references to supporting evidence are to documents contained in the Administrative Record, filed on July 31, 2008 at docket entry number 23.  The Administrative Record is Bates-stamped AR 1 through AR 53 and will be referenced herein using that numbering.

**Undisputed Facts**

1.   The Abbott Severance Pay Plan for Former U.S. Guidant Employees, 2006 Edition (the "Plan"), is a plan formed under the Employee Retirement Income Security Act, 29

1

U.S.C. § 1001, et seq. ("ERISA") in order to provide severance pay benefits to eligible employees who lose their jobs because of certain events specified in the Plan. AR 2.

2. The Plan sets forth the provisions in effect on April 21, 2006, and the Plan document serves as the official Plan document as well as the summary plan description, as required by ERISA. AR 2.

3. Under the terms of the Plan, participation in the Plan is limited to Eligible Regular Employees. AR 2. An Eligible Regular Employee is a Regular Employee who: (1) transferred employment to Abbott on April 21, 2006, in connection with the purchase by Abbott of the Vascular Intervention and Endovascular Solutions Business Groups; or (2) is employed by Guidant Endovascular Solutions, Inc.; or (3) is employed by Abbott to support the Vascular Intervention and Endovascular Solutions Business Groups. AR 10-11.

4. Under the terms of the Plan, a Regular Employee is an employee who is regularly scheduled to work at least 20 hours per week at Abbott. AR 12.

5. Under the terms of the Plan, an individual becomes a participant in the Plan as of the date he or she became an Eligible Regular Employee. AR 2.

6. The Plan provides benefits only in the event of a Qualifying Termination. AR 2.

7. Under the terms of the Plan, if an individual's employment is to be terminated due to a Qualifying Termination, he or she will receive a notice to that effect which will specify the date on which the individual's employment is expected to terminate. AR 2.

8. Under the terms of the Plan, an employee is entitled to benefits under the Plan if he or she satisfies the conditions in the Plan and: (1) his or her employment with Abbott terminates due to a Qualifying Termination; and (2) he or she is a participant in the Plan as of his or her termination date. AR 2-3.

9. Under the terms of the Plan, as a condition of receiving any Plan benefits (other than outplacement assistance), an eligible employee must sign, and not revoke, a Severance Agreement and Release. AR 2.

10. Under the terms of the Plan, a Qualifying Termination is defined as "a termination of regular employment with Abbott due to a permanent reduction in force or the elimination of your job or position." AR 2.

11. Under the terms of the Plan, the following events are not considered to be Qualifying Terminations, and an individual will not receive Plan benefits if Abbott determines that an individual's employment is terminated for any of the following reasons:

- Employee-initiated voluntary resignation;
- Misconduct;
- Unsatisfactory work performance;
- A layoff that is expected to be short-term (not greater than 90 days);
- Breach of an employment agreement;
- Merger with, or acquisition by, another organization, if an individual continues employment with or are hired by the new organization without an extended break in service; or
- Any termination other than one that is directly due to a permanent reduction in force or the elimination of the employee's position. AR 3.

12. Under the terms of the Plan, an individual will also not sustain a qualifying termination if:

> either before or after you receive a Notice, you accept an offer of employment in another position with Abbott, or you decline an employment offer from Abbott for a position that Abbott considers to be functionally equivalent to your current position and that will not require you to relocate.

AR 3.

13. Under the terms of the Plan, Abbott has the sole discretion to determine whether a position is functionally equivalent to the employee's current position. AR 3.

14. Under the terms of the Plan, eligible employees may receive: severance pay; a cost of living adjustment; medical, dental, vision and employee assistance plan premiums; and outplacement assistance. AR 3-4.

15. Under the terms of the Plan, the Plan Administrator administers the Plan and is a named fiduciary of the Plan. AR 6.

16. Under the terms of the Plan, the Plan Administrator is Abbott's Senior Vice President of Human Resources. AR 10.

17. The Plan states that the Plan Administrator "has the discretionary authority to interpret all Plan provisions and to determine all issues arising under the Plan, including issues of eligibility, coverage, and benefits." AR 6.

18. The Plan provides that the Plan Administrator "may delegate some of its responsibilities under the Plan to its agents." AR 6.

19. The Plan provides that any claim for unpaid benefits should be made in writing and submitted for consideration to the Abbott Corporate Benefits Department, Abbott Laboratories. AR 6.

20. The Plan provides that if a claimant is not satisfied with the Claim Administrator's decision, he or she may request an appeal. AR 7. The Plan provides that all appeals of an adverse decision by the Claim Administrator must be submitted to the Plan Administrator, Senior Vice President of Human Resources of Abbott. AR 7, 10.

21. Under the terms of the Plan, the Plan Administrator is charged with the task of making a full and fair review of the appeal and may review additional documents, if necessary, upon this review. AR 7.

22. The Plan provides that if a claimant is not satisfied with this decision, he or she may file a lawsuit in federal court under Section 502(a) of ERISA. AR 8.

23. Murray was employed by Guidant Corporation ("Guidant") for almost 21 years.

AR 14.

24. On or about April 21, 2006, Abbott purchased various shares of Guidant. AR 10.

25. On April 21, 2006, Abbott's purchase of Guidant closed. AR 10, 11.

26. In an August 11, 2006 letter, James F. Coppens, Divisional Vice President, Benefits (the "Claim Administrator") found that after the close date of this transaction, Abbott asked Murray to continue in his position as Vice President, Finance with a focus on Cardiac Therapies (previously called Vascular Intervention). AR 18.

27. In the August 11, 2006 letter, the Claim Administrator found that following this request, Murray's grade level, compensation, benefits, and bonus eligibility remained the same, and that Murray was offered a retention package consisting of a change in control benefit, a retention bonus, and 7,000 restricted stock units. *Id.*

28. On May 11, 2006, Murray submitted a claim for "all payments, benefits and rights under 'The Guidant Corporation Change in Control Severance Pay Plan For Select Employees'" as well as "a claim for all payments, benefits and rights under all other Severance Plans or related plans." AR 14.

29. On July 20, 2006, Murray wrote to Abbott and reminded Abbott that he had submitted a claim for severance benefits under the Plan, but had "not heard any response from Abbott regarding the other Severance Plans." AR 15.

30. Murray received a severance payment under The Guidant Corporation Change in Control Severance Pay Plan For Select Employees and that claim is not at issue in this case. AR 16.

31. On August 11, 2006, the Claim Administrator denied Murray's claim for benefits under the Plan. In that letter, the Claim Administrator begins by describing Murray's job as follows:

(1) "You were Vice President, Finance for Guidant Vascular Intervention until approximately August 2004," and that "your responsibilities included

5

managerial analysis and financial performance, measurement and planning. You reported to Keith Brauer, Vice President and Chief Financial Officer of Guidant Corporation."

(2)   "In August 2004, as a result of a company-wide reduction in force and the related consolidation of corporate responsibilities, you assumed responsibility for financial management of Guidant Cardiac Surgery and Guidant Endovascular Solutions, Inc. You continued to report to Mr. Brauer until Close."

(3)   During this period, "you served as Vice President, Finance, both before and after you assumed responsibility for Guidant Cardiac Surgery and Guidant Endovascular Solutions, Inc., your employment grade was EX8." AR 18.

32.    The August 11, 2006 letter states that "After Close, Abbott asked you to continue in your position as Vice President, Finance and to again focus your work on Cardiac Therapies (previously, Vascular Intervention). Your grade level was unchanged. Abbott offered you the same compensation, benefits, and bonus opportunity that you enjoyed prior to Close. You were also offered a retention package which consisted of your change in control benefit, a retention bonus and 7,000 restricted stock units." AR 18.

33.    The Claim Administrator, in the August 11, 2006 letter, determined that under the provisions of the Plan, Murray did not suffer a Qualifying Termination because his employment was not terminated as a result of a permanent reduction in force or a position elimination. AR 18.

34.    In the August 11, 2006 letter, Abbott concluded that: (1) there was no "qualifying termination" because "your employment was not terminated as a result of a permanent reduction in force or a position elimination"; (2) an "employee-initiated voluntary resignation such as yours is not a Qualifying Termination, and an employee who resigns is denied plan benefits"; (3) "when an employee is hired by the new organization without an extended break in service following a merger or acquisition, the employee has not had a "Qualifying Termination"; and (4) "no benefits are available if you decline an employment offer from Abbott for a position that

6

Abbott considers to be functionally equivalent to your current position and that will not require you to relocate." AR 18-19.

35. Under the terms of the Plan, an individual is not eligible for benefits when an employee is hired by the new organization without an extended break in service. AR 19. The Claim Administrator concluded that "Abbott sought to continue to employ you [Murray] without change on even more favorable terms than you had in your pre-Close role; however, you chose instead to voluntarily resign." *Id.*

36. The Claim Administrator determined, in the August 11, 2006 letter, that Murray's pre-close and post-close positions were functionally equivalent. AR 19. In that letter, the Claim Administrator also determined that Murray was a Vice President, Finance pre-close and would be a Vice President, Finance, post-close. AR 19. The letter further states that Murray's "employment grade and level remained unchanged post-Close, and you [Murray] would work in the same functional area, namely, Finance." *Id.* The August 11, 2006 letter states that "Abbott considers that your positions … are functionally equivalent, utilizing the same skills, education and experience considered necessary to the level of performance required of an Abbott vice president of finance on a company-wide basis." AR 19.

37. The Claim Administrator, in the August 11, 2006 letter, informed Murray of his appeal rights. AR 19.

38. On September 26, 2006, Murray appealed the Claim Administrator's decision and requested various documents utilized in the claim denial. AR 21.

39. In a September 26, 2006 appeal letter, Murray's attorney/representative, Steven Paul Cohn ("Cohn"), addressed the issues raised by the Plan's denial. With respect to the "functionally equivalent" argument advanced by Abbott, Cohn pointed out that "the offer of continuing or re-employment was at a substantially reduced position, which is not comparable to Mr. Murray's former executive level at Guidant." AR 21.

40. Cohn stated that "Mr. Murray was never informed that his grade level remained

7

1    unchanged." AR 23.

2      41.    Cohn stated that the Plan had incorrectly stated that Murray was Vice President (VP), Finance for Vascular Intervention (VI) until approximately August 2004. Cohn stated that "From August 2004 until the Close on April 21, 2006, Mr. Murray was the VP of Finance for Guidant VI, Cardiac Surgery (CS), and Endovascular Solutions (ES), reporting to Keith Brauer, VP of Finance and Chief Financial Officer of Guidant. At no time had Mr. Murray served solely as the VP of Finance for Guidant VI." AR 21.

42.    Cohn stated that Murray never received a formal positional offer, but instead, was given a proposed organizational chart and had a discussion regarding the position on or about April 17, 2006 with Chris Turek, VP, Finance at Abbott, John Capek, President VI (Cardiac Therapies), and Bob Boehm, VP Human Resources, VI (Cardiac Therapies). AR 21-22.

43.    Cohn stated that the proposed position discussed was a junior position that Murray had not been in for over 17 years. "The position had less scope, visibility and responsibilities, and reported to a manager one level lower than Mr. Murray had enjoyed at Guidant, where he had been the VP of Finance for three of Guidant's four business units; VI, CS and ES. Of these three business units, one went to Boston Scientific (CS), and two went to Abbott (VI and ES), with only one of these (VI) to be supported by Mr. Murray. The ES business was acquired by Abbott and placed under an existing Abbott executive and in doing so, the financial responsibilities were placed with an Abbott Controller." AR 22.

44.    Cohn's letter further stated: "Mr. Murray's position was in fact terminated, while he was offered a substantially, materially reduced role over one remaining unit of the three units he previously had financial directive over with Guidant." AR 22. Cohn stated that "Mr. Murray's pre-Close duties contained multiple functions besides Finance and included duties well beyond the scope of 'managerial analysis and financial performance, measurement and planning'." "The role proposed to Mr. Murray by Abbott was titled 'VP Controller VI', reporting directly to John Chapek, President of the VI business unit and a dotted line to Chris Turek, Abbott VP of Finance." Cohn stated that this amounted to "a significant reduction in Mr.

8

1 Murray's role and scope of responsibility." AR 23.

2  45. Cohn stated that at Guidant, Murray's responsibilities included "total combined revenues in excess of $1.3 billion." AR 22. Cohn stated that the new position's specific responsibilities include "a revenue base of 70% less." AR 22-23.

46. Cohn stated that the new position would have had responsibility, among other things, for Financial Reporting, financial Planning, Manufacturing Analysis and Cost accounting (VI only), and direct responsibility for approximately 47 people. AR 23.

47. The September 26 letter states that "in the proposed Abbott Vascular finance organization, a Controller reports to a divisional President, a Finance manager reports to a divisional President, and a Finance Director reports to a divisional President." Accordingly, Mr. Murray is placed, irrespective of the 'VP Controller VI' title, at a reporting level parallel to a Controller, Finance Manager, and a Finance Director." AR 23.

48. The September 26 letter states: "This organization was in place until an announcement on August 10, 2006, whereby Abbott named a new VP of Finance and Controller with substantially more responsibilities than offered to Mr. Murray. In fact, the role that was offered to Mr. Murray is virtually the same position now held by Linda Raggi, Controller, Cardiac Therapies (IV), who reports to John Capek and the Abbott Vascular VP of Finance. This underscores the fact that Mr. Murray was in an essentially demoted position and placed at a Controller/Director peer level." AR 23.

49. Cohn states that Murray was never informed that his grade level would remain the same. Cohn stated that "no emails or other correspondence were provided delineating that the compensation package was to remain unchanged … Guidant never produced any job description, offer letter, nor made any endeavor to clarify to Mr. Murray that he was indeed being retained in a his identical" role to the one he had served in at Guidant. AR 23-24.

50. Cohn requested all documents that Abbott relied on in denying Murray's claim for benefits. AR 24.

51. On December 19, 2006, the Divisional Vice President, Benefits, James F. Coppens, sent Murray's attorney the requested information regarding the claim denial. AR 26.

52. On January 30, 2007, Murray submitted additional information in support of his appeal. AR 36-49.

53. Based on the documents provided by Abbott, Cohn supplemented the Appeal based on the information contained in these documents. In his supplemental letter, Cohn pointed out a number of important facts gleaned from notes made by Maxine Bonn. Ms. Bonn's notes state that Murray was "VP of Finance for VI." Cohn stated that, as stated in his September 26, 2006 letter, Murray was never merely the VP of Finance for VI. Cohn then re-iterated the positions that Murray held. AR 36.

54. Murray also argued that his duties were significantly reduced in that his prior role contained duties and responsibilities besides finance, including the reporting relationships, the financial reporting responsibilities, the amount of revenue responsibilities, and taxation duties. AR 22. Murray stated that the position offered by Abbott was a reporting level parallel to lower positions. AR 23.

55. Cohn quotes a note from Maxine Bonn, Division Counsel, Abbott Laboratories Legal Division that states that "his job was eliminated." AR 36.

56. Ms. Bonn makes the following note: "Scope may be different. We don't want to include level like EX 7- level - Vice President." AR 35.

57. Cohn stated that the scope of the replacement position was "substantially different," and notes that the company did no analysis of "the traditional Vice President scope of duties at Abbott." AR 37.

58. Cohn's letter also reiterates the point made in previous correspondence – that Murray's position at Guidant had been substantially greater than the proposed position. AR 37.

59. Cohn re-addressed the issue of whether a substantially equivalent job was offered, concluding that Murray was offered a lesser position in terms of "authority, reporting, corporate

10

impact and visibility." AR 37-38.

60. On March 19, 2007, the Plan Administrator sent Murray a letter denying his appeal. AR 50-53.

61. On March 19, 2007, Abbott Senior Vice President Stephen R. Fussell responded to Cohn's September 26, 2006 and January 30, 2007 letters. AR 50-53. Mr. Fussell was the person at Abbott who was responsible for reviewing appeals from adverse benefit determinations and rendering decisions on appeal. AR 50-53.

62. The Plan Administrator reviewed Murray's appeal as well as the initial claim denial by the Claim Administrator and determined that Plaintiff was not entitled to any benefits under the Plan. AR 50.

63. The Plan Administrator noted in the March 19, 2007 letter that it is the Plan Administrator that must ultimately interpret the terms of the Plan. AR 51.

64. In the March 19, 2007 letter, the Plan Administrator interpreted the term job elimination to "involve situations where business exigencies require downsizing or the complete elimination of a position due to functional redundancies within the Abbott organization." AR 51.

65. Mr. Fussell makes the following comment regarding Ms. Bonn's note stating that "his job was eliminated:" "While the notes you cite were part of the information gathering process, the duty of plan interpretation and decision making falls to the Plan administrator and his delegates." Mr. Fussell makes no further comment on Ms. Bonn's note. AR51.

67. The letter also explained that Abbott's interpretation of functional equivalence does not require exact equivalence. AR 52. The letter also explained that Plaintiff's position was modified, post-close, to fit within the Abbott business model. *Id.*

68. The Plan Administrator determined in the March 19, 2007 letter that Abbott's inability to provide Murray with a position that "replicated each and every one of his pre-Close duties" is not a job elimination within the Plan terms. AR 51.

69. The Plan Administrator further states: "[W]e interpret a job elimination for

11

purposes of the Plan to involve situations where business exigencies require downsizing or the complete elimination of a position due to functional redundancies within the Abbott organization... The Plan does not provide for benefits where employment is continued in a modified form in order to fit into the Abbott business model. Mr. Murray's role in the finance function of the Abbott post-Close business model may have been modified it was not eliminated." AR 51.

70. Under the terms of the Plan, the Plan Administrator stated in the letter that it is in Abbott's sole discretion to determine functional equivalence. AR 51.

71. In the letter, the Plan Administrator interpreted functional equivalence to be based on general function, rather than specific duties. AR 52.

72. In the March 19, 2007 letter, the Plan Administrator determined that the finance position offered to Murray was functionally equivalent to his pre-Close position within the Abbott business model and that Murray would have received the same compensation and benefits and maintained a position in the same functional area. *Id.*

73. The Plan Administrator states that Murray "voluntarily resigned" from employment because he felt that the revised position with Abbott constituted a demotion and as a result of that "voluntary resignation" he was not entitled to benefits under the Plan. AR 51.

74. The Plan Administrator stated that Ms. Bonn's notes "were part of the information gathering process", but "the duty of Plan interpretation and decision making fall to the Plan administrator and his delegates." AR 51.

Dated: August 22, 2008                      WINSTON & STRAWN LLP

    /s/ Joseph J. Torres
By: Joseph J. Torres
Attorney for Defendant
THE ABBOTT SEVERANCE PAY PLAN FOR FORMER U.S. GUIDANT EMPLOYEES, 2006 EDITION

1   Dated:  August 22, 2008				DELFINO GREEN & GREEN

2							/s/ William Green

3							_____
							By:  William Green, Esq.
4							Attorney for Plaintiff
							MARK MURRAY

**CERTIFICATE OF SERVICE**

The undersigned, one of the attorneys for Defendant, The Abbott Severance Pay Plan For Former U.S. Guidant Employees, 2006 Edition, hereby certifies that on August 22, 2008, a true and correct copy of the foregoing JOINT STATEMENT OF UNDISPUTED FACTS was filed electronically with the Court. Notice of this filing will be sent to the parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Joseph J. Torres
Joseph J. Torres