1  William Green – SBN 129816
   Sharon Delfino Green - SBN 133703
2  DELFINO GREEN & GREEN
   1010 B Street, Suite 320
3  San Rafael, CA 94901
   Telephone: (415) 442-4646
4  Facsimile: (415) 442-4802

5
   Attorneys for Plaintiff,
6  MARK MURRAY

7              UNITED STATES DISTRICT COURT

8            NORTHERN DISTRICT OF CALIFORNIA

9                  SAN JOSE DIVISION

10 MARK MURRAY,                          Case No.:   C 08-00906 JW

11          Plaintiff,                   **NOTICE OF MOTION AND
                                         MOTION FOR SUMMARY
12     vs.                               JUDGMENT AND/OR SUMMARY
                                         ADJUDICATION OF ISSUES;
13 THE ABBOTT SEVERANCE PAY PLAN         MEMORANDUM OF POINTS AND
   FOR FORMER U.S. GUIDANT               AUTHORITIES IN SUPPORT
14 EMPLLOYEES, 2006 EDITION              THEREOF**

15                                       _____

16          Defendant.                   **Date:   October 16, 2008
                                         Time:   10 a.m.
17                                       Place:   Courtroom 8
                                         Judge:   Hon. James Ware**

18

19

20

21

22

23

24

25

26

27

28
                                    i

## **TABLE OF CONTENTS**

NOTICE OF MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.    Tender of Claim for Severance Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.    The Initial Denial of Benefits Under the Abbott Severance Plan . . . . . . . . . . . 3

        C.    The Response from Murray – the Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

                1.    Guidant position versus Abbott proposed position – leadership role . . . . 6

                2.    Guidant position versus Abbott proposed position – Revenue Base . . . . 6

                3.    Guidant position versus Abbott proposed position – Scope of Duties and

                       Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        D.    Request for Administrative Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        E.    The January 30, 2007 Letter from Cohn – the Appeal Supplement . . . . . . . . . . 8

        F.    The March 19, 2007 Letter – Abbott Laboratories' Decision on Appeal . . . . . . 9

II.   LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.    The Critical Issue – Whether Abbott Abused its Discretion in Determining that the

                Job Offered to Murray was the "Functional Equivalent" of the Job that Was

                Eliminated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        C.    Award and Attorneys Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ii

1

## TABLE OF AUTHORITIES

2

<u>CASES</u>

3    *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

4    *Concrete Pipe & Products of Calif., Inc. v. Construction Laborers Pension Trust for Southern*

5         *Calif.* 508 US 602, 622, 113 S.Ct. 2264, 2279 (1993) . . . . . . . . . . . . . . . . . . . .. .10, 11, 13

6    *Conseco v. Construction Laborers Pension Trust*, 93 F.3d 600 (9th Cir. 1996) . . . . . . . . . . . 14

7    *Eley v. Boeing Co.*, 945 F.2d 276, 278, n. 1 (9th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

8    *Kearney v. Standard Ins. Co.* 175 F3d 1084 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

9    *McKenzie v. Gen. Tel. Co.*, 41 F.3d 1310, 1316 (9th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . 11

10   *Nelson v. EG&G Measurements Group*, 37 F.3d 1384 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . 13

11   *Snow v. Standard Ins. Co.* (9th Cir. 1996) 87 F3d 327, 331–332 (reversed on other grounds in

12        *Snow v. Standard Ins. Co.* (9th Cir. 1999) 1999 WL 369799) . . . . . . . . . . . . . . . . . . . . 11

13   *Taft v. Equitable Life Assur. Soc.,* 9 F.3d 1469, 1473 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . 10

14

15

<u>STATUTES</u>

16   29 U.S.C. § 1132 (a)(1)(B)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

17   29 U.S.C. section 1132(g)(1)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

18

<u>TREATISTS</u>

19   Croskey, J., *California Practice Guide – Insurance Litigation* (TRG 2007) at ¶6:1839 . . . 11, 13

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION**

NOTICE IS HEREBY GIVEN THAT on October 16, 2008, at 10:00 a.m., Courtroom 8 of the above-captioned Court, located at 280 South 1st Street, in San Jose, California, plaintiff Mark Murray ("Murray"), will and hereby does move the Court for Summary Judgment and/or Summary Adjudication of the following issues: (1) whether the position Murray was in at Guidant prior to Abbott's purchase of Guidant was eliminated according to the terms of The Abbott Severance Pay Plan for Former U.S. Guidant Employees, 2006 Edition ("the Abbott Severance Plan" or "the Plan"); (2) whether the position Murray was supposedly offered at the time of the close was the functional equivalent of the positions he held with Guidant prior to Abbott's purchase of Guidant under the Plan; (3) whether there was a "qualifying termination" under the Plan due to the elimination of Murray's prior position with Guidant; (4) whether Murray is entitled to benefits under the plan; and, (5) whether Murray is entitled to attorneys fees and costs pursuant to 29 U.S.C. section 1132(g)(1).[1]

This motion is based on FRCP 56, this Notice, the Points and Authorities referenced herein, the Administrative Record filed by Defendants, and upon such other and further evidence and argument as may be submitted to the Court in Opposition Briefs, Reply Briefs and Oral Argument.

**MOTION**

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff, Mark Murray ("Murray") hereby submits the following Memorandum of Points and Authorities in support of his Motion for Summary Judgment and/or Summary Adjudication of Issues.

---

[1] By setting forth the issues in this fashion, Murray is not implying that there must be separate finding with respect to each of these issues. For example, as shown in the Memorandum of Points and Authorities, the issues of job elimination and qualifying termination are subsets of the key issue – whether the post purchase position supposedly offered to Murray was the functional equivalent of the position Murray held at Guidant.

1

I.    **INTRODUCTION**

Murray was employed by Guidant Corporation from 1985 until April 21, 2006.  On April 21, 2006, Abbott Laboratories' purchase of Guidant Corporation closed.  At the time of close, Murray held senior executive positions with three Guidant entities – VP of Finance of Guidant Vascular Interventions (VI), Vice President of Finance of Guidant Cardiac Surgery (CS), and Vice President of Finance of Guidant Endovascular Solutions (ES).  In his capacity as Vice President of each of these three Guidant entities, Murray reported to Keith Brauer, VP of Finance and Chief Financial Officer of the parent corporation, Guidant.

Although Abbott never actually provided Murray with a formal positional offer, in the days preceding the close, Murray was given a proposed organizational chart and had discussions with several Abbott managers regarding the position they wanted him to fill after close.  (AR 21-22) After receiving this information, Murray concluded that the proposed post-close position was a junior position that Murray had not been in for over 17 years.  Murray further concluded that the proposed position had less scope, visibility and responsibilities, and reported to a manager one level lower than he had at Guidant.  Based on this information, Murray advised Abbott that, in his view, his former position had been eliminated and he was entitled to benefits under all applicable severance plans.

Abbott paid Murray his severance benefits under one of the two applicable severance plans, but refused to pay under the other.  The refusal was based on the claim that Murray's position was not eliminated since he was offered a "functionally equivalent" post-close position. In response to the denial, Murray submitted several appeal letters supporting his claim that the position he was offered was not functionally equivalent to his pre-close position.  In fact, Murray demonstrated unequivocally that the post-close position drastically reduced both the nature and scope of the responsibilities he had while employed with Guidant.  He also demonstrated that Abbott had made critical errors in its investigation of his claim, including errors as fundamental as incorrectly *describing* his pre-close title and responsibilities, and ignoring its own Attorney/Investigator's opinion that his job had, in fact, been "eliminated."

2

Despite Murray's logical and highly detailed explanations of how the new position represented a

drastic reduction in Murray's authority, reporting, corporate impact and visibility, Abbott held

stubbornly to its baseless denial.  When his final appeal was denied, Murray was left with no

choice but to ask this Court to find that Abbott's denial was an abuse of discretion and to

reverse the baseless denial of severance benefits.

## II.    FACTUAL BACKGROUND

### A.    Tender of Claim for Severance Benefits

Murray was employed by Guidant Corporation ("Guidant") for almost 21 years (between

1985 and 2006).  (AR 14)  On April 21,2006, Abbott's purchase of Guidant closed.  (AR 10, 11)

Following the close of the sale, Murray's position with Guidant was eliminated.  As a result, on

May 11, 2006, Murray wrote to Abbott advising that he was making a claim for benefits under

any and all Severance Plans maintained by Abbott.[2]  (AR 14)

On July 20, 2006, Murray wrote to Abbott and reminded Abbott that he had submitted a

claim for severance benefits under the Abbott Severance Plan, but had not yet been paid the

benefits due under that plan.  (Murray included a copy of the Abbott Severance Plan with his e-

mail.)  (AR 15)

### B.    The Initial Denial of Benefits Under the Abbott Severance Plan

On August 11, 2006, Abbott denied Murray's claim for benefits under the Abbott

Severance Plan.  In that letter, Abbott begins by describing Murray's job as follows:

(1)    "You were Vice President, Finance for Guidant Vascular Intervention until

approximately August 2004," and that "your responsibilities included managerial

analysis and financial performance, measurement and planning."  "You reported

---

[2]    There were two applicable severance plans in effect at Abbott at the time Murray
submitted his claim – (1) The Abbott Severance Pay Plan for Former U.S. Guidant Employees, 2006
Edition ("the Abbott Severance Plan"), and (2) The Guidant Corporation Change In Control
Severance Pay Plan For Select Employees" ("the Guidant Severance Plan").  Murray was eventually
paid under the Guidant Severance Plan (AR 16), but not under the Abbott Severance Plan (AR 50-
53).

3

to Keith Brauer, Vice President and Chief Financial Officer of Guidant Corporation."

(2)     "In August 2004, as a result of a company-wide reduction in force and the related consolidation of corporate responsibilities, you assumed responsibility for financial management of Guidant Cardiac Surgery and Guidant Endovascular Solutions, Inc."  You reported to Keith Brauer for this position as well.

(3)     During this period, "you served as Vice President, Finance, both before and after you assumed responsibility for Guidant Cardiac Surgery and Guidant Endovascular Solutions, Inc."

(4)     "your employment grade was EX8."  (AR 18)

Abbott also claimed that it asked Murray "to continue in your position as Vice President, Finance and to again focus your work on Cardiac Therapies." Abbott further stated in its August 11, 2006 letter that: "Your grade level was unchanged and you were offered the same compensation, benefits and bonus opportunity that you had prior to Close."[3]  (AR 18)

From these facts, Abbott concluded that: (1) there was no "Qualifying Termination" because "your employment was not terminated as a result of a permanent reduction in force or a position elimination;" (2) a "voluntary resignation such as yours is not a Qualifying Termination;" and, (3) "no benefits are available if you decline an employment offer from Abbott for a position that Abbott considers to be functionally equivalent to your current position...".[4]  (AR 18-19)

_____

[3]     As shown below, this August 11, 2006 was the first time anyone at Abbot thad ever stated that Murray's post close compensation and grade level would remain the same.  (AR 18 )

[4]     Benefits under the Abbott Plan are payable when there is a "Qualifying Termination" – "a termination of regular employment with Abbott due to a permanent reduction in force or the elimination of your job or position."  There is no "Qualifying Termination" if you "decline an employment offer from Abbott for a position that Abbott considers to be functionally equivalent to your current position ...".  (AR 3, 12)

4

### C.    The Response from Murray – the Appeal

In a September 26, 2006 letter, Murray's attorney/representative, Steven Paul Cohn ("Cohn"), addressed the issues raised by Abbott's denial.[5]  With respect to the "functionally equivalent" argument advanced by Abbott, Mr. Cohn pointed out that "the offer of continuing or re-employment was at a substantially reduced position, which was not comparable to Mr. Murray's former executive level at Guidant."

Cohn pointed out to Abbott that it had incorrectly stated that he was Vice President (VP), Finance for Vascular Intervention (VI).  Cohn in fact showed Abbott that Murray had held a number of VP positions concurrently from December 1994 to Close:  "From August 2004 until the Close on April 21, 2006, Mr. Murray was the VP of Finance for Guidant VI, Cardiac Surgery (CS), and Endovascular Solutions (ES), reporting to Keith Brauer, VP of Finance and Chief Financial Officer of Guidant.  At no time had Mr. Murray served solely as the VP of Finance for Guidant VI."  (AR 21)

Additionally, Cohn pointed out that Murray never received a formal positional offer, but instead, was given a proposed organizational chart and had a discussion regarding the position on or about April 17, 2006 with Chris Turek, VP, Finance at Abbott, John Capek, President VI (Cardiac Therapies), and Bob Boehn, VP Human Resources, VI (Cardiac Therapies).  (AR 21-22) The proposed position discussed was a junior position that Murray had not been in for over 17 years.  (AR 22)  "The position had less scope, visibility and responsibilities, and reported to a manager one level lower than Mr. Murray had enjoyed at Guidant, where he had been the VP of Finance for three of Guidant's four business units; VI, CS and ES.  Of these three business units, one went to Boston Scientific (CS), and two went to Abbott (VI and ES), with only one of these (VI) to be supported by Mr. Murray.  The ES business was acquired by Abbott and placed under an existing Abbott executive and in doing so, the financial responsibilities were placed with an Abbott Controller."  (AR 22)

---

[5]    Although this letter was signed by Cohn, all of the information and much of the drafting itself was provided by Murray himself.

5

The letter further stated: "Mr. Murray's position was in fact terminated, while he was offered a substantially, materially reduced role over one remaining unit of the three units he previously had financial directive over with Guidant." Cohn pointed out that "Mr. Murray's pre-Close duties contained multiple functions besides Finance and included duties well beyond the scope of 'managerial analysis and financial performance, measurement and planning'." "The role proposed to Mr. Murray by Abbot was titled "VP Controller VI", reporting directly to John Capek, President of the VI business unit and a dotted line to Chris Turek, Abbott VP of Finance. This amounted to a significant reduction in the role and scope of responsibility that Mr. Murray had enjoyed." (AR 23)

**1.     Guidant position versus Abbott proposed position – leadership role**

Cohn also pointed out that at Guidant (pre-close) Murray was a member of each business units' top leadership team (all of whom were Vice Presidents), a member of Guidant's CFO staff reporting directly to the CFO of the Guidant parent corporation, and an Officer of several Guidant legal entities (*e.g.*, Advanced Cardiovascular Systems, Endovascular Therapies, Guidant Investment Corp., and several others). The post-close position at Abbott would have made Murray a member of *only* VI's top leadership team and would have involved only "dotted line" reporting to an Abbott VP of Finance rather than to Abbott's CFO.

**2.     Guidant position versus Abbott proposed position – Revenue Base**

At Guidant, Murray's responsibilities included total combined revenues in excess of $1.3 billion; at Abbott, he would have been responsible for a revenue base that was 70% less. (AR 23)

**3.     Guidant position versus Abbott proposed position – Scope of Duties and Responsibilities**

Murray's position prior to close involved:

• Financial Reporting, Financial Planning, Manufacturing Analysis and Cost accounting;

• Pricing, sales reporting and analysis for CS and ES;

6

- Guidant's U.S. Credit and Collections, Rebates and GPOs;

- Member of Guidant's Treasury Oversight Committee;

- Sarbanes Oxley compliance, including certifcation of 10Ks and 10Qs;

- U.S. sales and use tax planning and compliance;

- U.S. and State income tax for each of the three business units;

- Direct responsibility for approximately 85 individuals; and,

- Corporate recruiting

Post-close, Murray would have had responsibility for Financial Reporting, financial Planning, Manufacturing Analysis and Cost accounting (but for VI only), and direct responsibility for approximately 47 people.  (AR 23)  All of this was pointed out to Abbott in Cohn's September 26, 2006 letter.  (AR 22-23)

The September 26 letter goes on to point out that in the proposed organizational hierarchy at Abbott, a Controller reports to a divisional President, a Finance Manager reports to a divisional President, and a Finance Director reports to a divisional President.  "Accordingly, Mr. Murray is placed, irrespective of the 'VP Controller VI' title, at a reporting level parallel to a Controller, Finance Manager, and a Finance Director." (AR 23)  That was a level below where he was in his pre-close positions for Guidant.

Cohn's September 26 letter also points out that Abbott Vascular did not fill Murray's proposed role; instead, Abbott appointed two controllers and two directors, who each supported a respective divisional President.  "This organization was in place until an announcement on August 10, 2006, whereby Abbott named a new VP of Finance and Controller with substantially more responsibilities than offered to Mr. Murray – the role offered to Mr. Murray is virtually the same position now held by Linda Raggi, Controller, Cardiac Therapies (IV), who reports to John Capek and the Abbott Vascular VP of Finance.  This underscores the fact that Mr. Murray was in an essentially demoted position and placed at a Controller/Director peer level."  (AR 23)

Finally, Cohn points out that Murray was never informed that his grade level would remain the same.  There was no written confirmation delineating the compensation package

7

would remain the same, no job description was ever produced, no offer letter sent, or was any attempt made to clarify that he was being retained in a supposedly identical role to the one he had served in at Guidant.  (AR 23-24)

**D.    Request for Administrative Record**

In conjunction with the September 26 letter, Cohn requested all documents that Abbott relied on in denying Murray's claim for benefits.  (AR 24) On December 19, 2006, Abbott wrote back to Cohn and provided the required documents.  (AR 26)  Cohn supplemented the Appeal based on the information contained in these documents.

**E.    The January 30, 2007 Letter from Cohn – the Appeal Supplement**

In his supplemental letter, Cohn pointed out a number of important facts gleaned from notes made by Maxine Bonn, Division Counsel, Abbott Laboratories Legal Division, in her investigation of Murray's claim.

First, Ms. Bonn's notes state that Murray was  "VP of Finance for VI."  Mr. Cohn pointed out that, as stated in his September 26, 2006 letter, Murray was never merely the VP of Finance for VI. Cohn then re-iterated the positions that Murray held.  (AR 36)

Second, Mr. Cohn quotes a note from Ms. Bonn that states that "his job was eliminated." (AR 36)  This supports Murray's position that his job was, in fact, eliminated.  Obviously, this is a direct contradiction to Abbott's position that Murray's job had not been "eliminated."

Third, on page 4 of Ms. Bonn's notes, she makes the following note: "Scope may be different. We don't want to include level like EX 7- level - Vice President." (AR 35)  Again, Cohn points out that the scope of the replacement position was "substantially different," and notes that the company did no analysis of the traditional Vice President scope of duties at Abbott.  (AR 37)  Cohn's letter also reiterates the point made in previous correspondence – that Murray's position at Guidant had been substantially greater than the proposed position.  (AR 37)

Fourth, Cohn noted that Abbott had apparently failed to review organizational documents, including organization charts (AR 45-47) which showed that Murray would be functioning at a substantially different (lower) level in the new position.  (AR 37)

8

Finally, Mr. Cohn then very persuasively re-addresses the issue of whether a substantially equivalent job was offered, concluding that Murray was offered a lesser position in terms of "authority, reporting, corporate impact and visibility."  (AR 37-38)

**F.**     **The March 19, 2007 Letter – Abbott Laboratories' Decision on Appeal**

On March 19, 2007, Abbott Senior Vice President Stephen R. Fussell responded to Cohn's September 26, 2006 and January 30, 2007 letters.  (AR 50-53)  Mr. Fussell was the person at Abbott who was responsible for reviewing appeals from adverse benefit determinations and rendering decisions on appeal. (AR 50-53)

Mr. Fussell begins by disagreeing with Murray's "interpretation" of Attorney Bonn's notes stating that Murray's position had been eliminated.  (AR 51)  Significantly, although he says that he disagrees with what he calls Murray's "interpretation," he does not state why Murray's "interpretation" is incorrect, nor does he offer any other reasonable alternative "interpretation" of the unambiguous words used by Attorney/Investigator Bonn.  (Remember, her notes state – "his job was eliminated."  (AR 42)  Instead, Mr. Fussell's merely states that: Attorney Bonn's notes "were part of the information gathering process", but "the duty of Plan interpretation and decision making fall to the Plan administrator and his delegates."  (AR 51) What Mr. Fussell means is anyone's guess, but presumably he is saying that Abbott is rejecting its own Attorney/Investigator's opinion that Murray's pre-close position was eliminated.

Mr. Fussell further states: "[W]e interpret a job elimination for purposes of the Plan to involve situations where business exigencies require downsizing or the complete elimination of a position due to functional redundancies within the Abbott organization....  The Plan does not provide for benefits where employment is continued in a modified form in order to fit into the Abbott business model.  Mr. Murray's role in the finance function of the Abbott post-Close business model may have been modified it was not eliminated."  (AR 51)  Of course, this simply begs the question of "functional equivalence" – i.e., if the post close position with Abbott was not the functional equivalent of the pre-close position with Guidant, then there is a "qualifying

9

1   termination" and an entitlement to benefits.[6]

2       Mr. Fussell also states that Murray "voluntarily resigned" from employment because he

3   felt that the revised position with Abbott constituted a demotion and as a result of that

4   "voluntary resignation" he was not entitled to benefits under the Plan.  (AR 51)  Again, this

5   simply begs the question of whether the post close position was the "functional equivalent" of

6   the pre-close position.  If it was not, then Murray's job was eliminated and he is entitled to

7   benefits under the Abbott Severance Plan.

8       On page three of his letter, Mr. Fussell finally gets to the real issue of whether the new

9   position was the "functional equivalent" of the old position.  (AR 52) Here, Abbott makes

10  several arguments.  First, he accuses Cohn of requiring "exact equivalence."  That is plainly not

11  the case.  In fact, as shown above and in the record, Cohn provided Abbott with a very detailed

12  explanation of how *the new job was not even close to being the functional equivalent of the old*

13  *job* in terms of authority, reporting, corporate impact and visibility.

14  **II.     LEGAL ANALYSIS**

15      **A.     Standard of Review**

16      [A]n abuse of discretion is shown where the administrator relies on "clearly erroneous

17  findings of fact" in making benefit determinations.  *Taft v. Equitable Life Assur. Soc.,* 9 F.3d

18  1469, 1473 (9th Cir. 1993).  A finding is 'clearly erroneous' when 'although there is evidence to

19  support it, ***the reviewing (body) on the entire evidence is left with the definite and firm***

20  ***conviction that a mistake has been committed.'*** *Concrete Pipe & Products of Calif., Inc. v.*

21

22          [6]    It is also important to note that what Mr. Fussell characterizes as a mere
23  "interpretation" of the plan language goes far beyond the plain language of the plan itself.
    Remember, the plan clearly states that a "Qualifying Termination" is "a termination of regular
24  employment with Abbott due to a permanent reduction in force or the elimination of your job or
    position."  It says nothing about a requirement that "business exigencies require downsizing" or that
25  there must be "a complete elimination of a position due to functional redundancies within the Abbott
26  organization."  This is not mere "interpretation."  Rather, it is a wholesale re-writing of the plan.
    That is not permissible and constitutes a clear abuse of discretion by the plan administrator/fiduciary.
27

28                                              10

*Construction Laborers Pension Trust for Southern Calif.* 508 US 602, 622, 113 S.Ct. 2264, 2279 (1993) (emphasis added; internal quotes omitted)] see also, Croskey, J., *California Practice Guide – Insurance Litigation* (TRG 2007) at ¶6:1839.

A decision that is not supported by *substantial evidence* in the record also constitutes an abuse of discretion. *McKenzie v. Gen. Tel. Co.*, 41 F.3d 1310, 1316 (9th Cir.1994); *see, Snow v. Standard Ins. Co.* (9th Cir. 1996) 87 F3d 327, 331–332 (reversed on other grounds in *Snow v. Standard Ins. Co.* (9th Cir. 1999) 1999 WL 369799), ("The [abuse of discretion] standard certainly does not permit the overturning of a decision where there is substantial evidence to support the decision, that is, where there is 'relevant evidence [that] reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence."); *Eley v. Boeing Co.*, 945 F.2d 276, 278, n. 1 (9th Cir.1991) (clarifying that ERISA's abuse of discretion standard requires that the plan administrator support its decisions by "substantial evidence"), overruled on other grounds, *Kearney v. Standard Ins. Co.* 175 F3d 1084 (9th Cir. 1999); "Substantial evidence" is "more than a mere scintilla but less than a preponderance; it is such evidence that a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.1995).

**B.      The Critical Issue – Whether Abbott Abused its Discretion in Determining that the Job Offered to Murray was the "Functional Equivalent" of the Job that Was Eliminated.**

By applicable standard, Abbott has failed to meet its burden.  As shown above, Murray's representative repeatedly used specific, concrete reasons and analysis to demonstrate to Abbott that the proposed job was in no way, shape, or form the functional equivalent of his prior position.  Instead of responding to those items, Abbott ignored most and responded with vague generalities to the others.

For example –

•      When Abbott claimed that Murray's position with Guidant was VP of Finance for Guidant VI, Murray's representative wrote back and pointed out that from

11

2004 until the close, Murray was the VP of Finance for <u>Guidant VI, Guidant CS, and Guidant ES</u>, reporting to Keith Brauer, VP of Finance and Chief Financial Officer of Guidant.(AR 21).  Abbott never even acknowledged that its information was wrong or the effect of the correct information on the analysis of the "functional equivalence" issue.

- When Abbott claimed that the position with Abbott would be the functional equivalent of the position he occupied at Guidant, Murray pointed out that (1) the proposed position discussed was a junior position that Murray had not been in for over 17 years; (AR 22) and, (2) the proposed position with Abbott had less scope, visibility and responsibilities, and required Murray to report to a manager one level lower than Murray had at Guidant.

- When Abbott claimed that the post-close job paid the same as the pre-close position, Murray pointed out that he was never informed that his job grade level or compensation would remain the same, nor was he ever provided with any job description or offer letter whatsoever for the proposed new position.  *Further, even after Murray expressed concern to Abbott over his reduced role, no additional effort was made by Abbott to explain what his role would be with Abbott.*

- In response to Abbott's claim that the job offered would have been the functional equivalent of his prior position, Murray pointed out that Abbott's actions after his termination showed just the opposite.  In fact, Abbott did not even fill the position that Murray was supposedly offered.  Instead, Abbott appointed two controllers and two directors, who each supported a respective divisional President.  Then, on August 10, 2006, Abbott named a new VP of Finance and Controller with substantially more responsibilities than offered to Murray: Murray pointed out that "the  role that was offered to Mr. Murray is virtually the same position now held by Linda Raggi, Controller, Cardiac therapies (VI), who

12

reports to John Capek and the Abbott Vascular VP of Finance. This underscores the fact that Mr. Murray was in an essentially demoted position and placed at a Controller/Director peer level." (AR 23)

•    When Abbott claimed that the duties of the two positions were essentially the same, Murray gave a list of the duties and responsibilities for the pre and post close positions, pointing out that the post-close position had significantly less responsibility in terms of leadership, revenue base, and financial and non-financial duties and responsibilities.

•    When Abbott provided its Attorney/Investigator's notes, Murray pointed out that Abbott's own Attorney/Investigator had admitted that "his job was eliminated" and that the "scope may be different."

Again, even under an abuse of discretion standard, Murray is confident that the Court will be "left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Products of Calif., Inc. v. Construction Laborers Pension Trust for Southern Calif.* 508 US 602, 622, 113 S.Ct. 2264, 2279 (1993) (emphasis added; internal quotes omitted)] see also, Croskey, J., *California Practice Guide – Insurance Litigation* (TRG 2007) at ¶6:1839. Abbott's denial of benefits was based on a number of clearly erroneous findings of fact, as well as a complete failure to account for the detailed and reasoned explanation by Murray of how the proposed position was not even close to being functionally equivalent to his prior positions at Guidant. Anyone reviewing this record would be convinced, beyond any doubt, that Abbott's denial constitutes an abuse of discretion and that Murray must be paid the benefits he is owed under the severance plan.

### C.    Award and Attorneys Fees

Under the civil enforcement provisions of ERISA, a plan participant may recover benefits due under the terms of the plan (29 U.S.C. § 1132 (a)(1)(B)), along with pre-judgment interest (*Nelson v. EG&G Measurements Group*, 37 F.3d 1384 (9th Cir. 1994).

As shown above and in the Administrative Record, Murray is entitled to benefits under

13

1   the plan.  He is also entitled to pre-judgment interest.

2          Additionally, pursuant to 29 U.S.C. section 1132(g)(1), Murray is entitled to recover his

3   attorneys' fees and costs.  In fact, according to the Ninth Circuit such an award must be made

4   "absent special circumstances that make such an award unjust."  *Conseco v. Construction*

5   *Laborers Pension Trust*, 93 F.3d 600 (9th Cir. 1996).  As a result of the abuse of discretion by

6   Abbott, Murray was forced to retain the services of legal counsel for this lawsuit, and has

7   necessarily incurred attorneys' fees and costs in prosecuting this action.  As such, he should be

8   awarded reasonable attorneys' fees and costs.

9   **III.     CONCLUSION**

10         Abbott was given discretion as the Plan administrator/fiduciary.  As such, Abbott is

11  supposed to act as a fiduciary.  Instead, Abbott abused its discretionary power and made a

12  decision that is absolutely contrary to the detailed, pertinent information and analysis provided

13  by Murray.  In short, Abbott abused its discretion by concluding that the new proposed position

14  was "functionally equivalent" to the position Murray previously held with Guidant.  The new

15  position was at a lower level on the corporate ladder, involved supervision and responsibility

16  over significantly fewer personnel, involved responsibility for a significantly lower valued

17  entity, and most importantly, involved only one minor aspect of the functions Murray performed

18  prior to Close.  As such, the new proposed position was not in any way, shape or form, the

19  "functional equivalent" of the prior position.

20         Murray respectfully requests that this court grant summary judgment on the

21  administrative record, award him the benefits he is entitled to under the Plan together with pre-

22  judgment interest and attorneys fees.

23  Dated:  August 22, 2008                         DELFINO GREEN & GREEN

24

25                                          _____/s/_____

26                                          William Green
                                            Attorney for Plaintiff,
                                            MARK MURRAY

27

28                                          14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15