Joseph J. Torres (Admitted *Pro Hac Vice*)
Sheila P. Frederick (Admitted *Pro Hac Vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone:    312-558-5600
Facsimile:    312-558-5700
Email: jtorres@winston.com
       sfrederick@winston.com

Robert Spagat (SBN: 157388)
Allison M. Dibley (SBN: 213104)
WINSTON & STRAWN LLP
101 California Street
San Francisco, California 94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
Email: rspagat@winston.com
       adibley@winston.com

Attorneys for Defendant
THE ABBOTT SEVERANCE PAY PLAN
FOR FORMER U.S. GUIDANT
EMPLOYEES, 2006 EDITION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MARK MURRAY,<br><br>           Plaintiff,<br><br>     v.<br><br>THE ABBOTT SEVERANCE PAY PLAN<br>FOR FORMER U.S. GUIDANT<br>EMPLOYEES, 2006 EDITION,<br><br>           Defendant. | CASE NO.: C 08-00906 JW<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

1

## TABLE OF CONTENTS

2   NOTICE OF MOTION AND MOTION..................................................................................1

3   MEMORANDUM OF POINTS AND AUTHORITIES.....................................................2

4   INTRODUCTION...........................................................................................................2

5   FACTUAL BACKGROUND..........................................................................................3

6        I.      The Parties ................................................................................................3

7        II.     The Abbott Severance Pay Plan For Former U.S. Guidant Employees, 2006 Edition .3

8                A.      The Establishment Of The Plan........................................................3

9                B.      Plan Eligibility..................................................................................4

10               C.      The Claims Process ...........................................................................4

11       III.    Plaintiff Resigns And Seeks Severance Benefits Under The Plan ...............5

12               A.      Plaintiff's Initial Claim For Benefits ...............................................5

13               B.      Plaintiff's Appeal..............................................................................6

14               C.      Plaintiff's Complaint ........................................................................8

15   ARGUMENT....................................................................................................................8

16       I.      Standard Of Review..................................................................................8

17               A.      The Abuse Of Discretion Standard Applies .....................................8

18       II.     The Plan Properly Denied Plaintiff's Claim For Benefits ..........................10

19               A.      The Plan's Denial Of Benefits Was Not An Abuse Of Discretion..........10

20                       1.      Murray's Position Was Not Eliminated..............................10

21                       2.      Murray Was Offered And Declined A Functionally Equivalent
                                 Position .............................................................................11

22               B.      Plaintiff's Arguments Do Not Support A Contrary Outcome ..........12

23               C.      There Is No Conflict Of Interest.....................................................13

24   CONCLUSION ................................................................................................................15

25

26

27

28

i

Defendant's Notice Of Motion And Motion For Summary Judgment Or Summary Adjudication
And Memorandum Of Points And Authorities In Support Thereof, Case No. C08-00906 JW

1

# TABLE OF AUTHORITIES

2

Page(s)

3

CASES

4

*Awbrey v. Pennzoil Co.,*
    961 F.2d 928 (10th Cir. 1992) ................................................................ 12, 13

5

*Estate of Shockley v. Alyeska Pipeline Service Co.,*
    130 F.3d 403 (9th Cir. 1997) ....................................................................... 10

6

7

*Firestone Tire & Rubber Co. v. Bruch,*
    489 U.S. 101 (1989) .......................................................................................... 8

8

9

*Friedrich v. Intel Corp.,*
    181 F.3d 1105 (9th Cir. 1999) ......................................................................... 9

10

*Garavuso v. Shoe Corps. of Am. Industries,*
    709 F. Supp. 1423 (S.D. Ohio 1989) ............................................................. 12

11

12

*Gilliam v. Nevada Power Co.,*
    488 F.3d 1189 (9th Cir. 2007) ......................................................................... 8

13

14

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,*
    370 F.3d 869 (9th Cir. 2004) ........................................................................... 9

15

*Killian v. Healthsource Provident Adm's, Inc.,*
    152 F.3d 514 (6th Cir. 1998) ........................................................................... 9

16

17

*Madden v. ITT Long Term Disability Plan for Salaried Employees,*
    914 F.2d 1279 (9th Cir. 1990) ......................................................................... 9

18

19

*Martin v. Continental Casualty Co.,*
    96 F. Supp. 2d 983 (N.D. Cal. 2000) ................................................. 10, 13, 14

20

*Metropolitan Life Insurance Co. v. Glenn,*
    554 U.S. __, 128 S.Ct. 2343 (2008) .......................................................... 14, 15

21

22

*Nolan v. Heald College,*
    No. C05-03399 MJJ, 2007 WL 878946 (N.D. Cal. Mar. 21, 2007) .............. 15

23

24

*Oster v. Barco of Cal. Employees' Retirement Plan,*
    869 F.2d 1215 (9th Cir. 1988) ...................................................... 10, 11, 12, 14

25

*Otero Carrasquillo v. Pharmacia Corp.,*
    466 F.3d 13 (1st Cir. 2006) ....................................................................... 12, 13

26

27

*Santini v. Cytec Industries,*
    537 F. Supp. 2d 1230 (S.D. Ala. 2008) .......................................................... 13

28

ii

1

2

*Smith v. United Television, Inc. Special Severance Plan,*
    474 F.3d 1033 (8th Cir. 2007) ................................................................................. 11

*Winters v. Costco Wholesale Corp.,*
    49 F.3d 550 (9th Cir. 1995), *cert. denied,* 516 U.S. 908 (1995) ............................... 9

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant's Notice Of Motion And Motion For Summary Judgment Or Summary Adjudication
And Memorandum Of Points And Authorities In Support Thereof, Case No. C08-00906 JW

1

## <u>NOTICE OF MOTION AND MOTION</u>

2 TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:

3      PLEASE TAKE NOTICE THAT on October 6, 2008 at 9:00 a.m. in Courtroom No. 8 of the

4 above-entitled Court, located at 280 South 1st Street, San Jose, California, Defendant The Abbott

5 Severance Pay Plan for Former U.S. Guidant Employees, 2006 Edition, will and hereby does move

6 for an order granting summary judgment on the administrative record on all of Plaintiff's claims in

7 favor of Defendant.

8      Defendant's motion is based upon this Notice of Motion and Motion, the Memorandum of

9 Points and Authorities in support thereof and filed and served herewith, the Administrative Record,

10 and such other matters as may be presented to the Court, including response briefs, reply briefs, and

11 oral argument.  Alternatively, and in the event that summary judgment is not granted on all claims,

12 Defendant seeks summary adjudication of all issues which may be separately resolved.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant's Notice Of Motion And Motion For Summary Judgment Or Summary Adjudication
And Memorandum Of Points And Authorities In Support Thereof, Case No. C08-00906 JW

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2      Pursuant to Federal Rule of Civil Procedure 56(b) and Local Rule 56, Defendant, The Abbott

3  Severance Pay Plan for Former U.S. Guidant Employees, 2006 Edition, hereby submits the

4  following Memorandum of Points and Authorities in Support of its Motion for Summary Judgment

5  or Summary Adjudication.

6

## INTRODUCTION

7      Plaintiff Mark Murray ("Plaintiff" or "Murray") filed this action under the Employment

8  Retirement Income Security Act ("ERISA"), seeking judicial review of the denial of severance

9  benefits allegedly due under the terms of the Abbott Severance Pay Plan for Former U.S. Guidant

10  Employees, 2006 Edition (the "Plan").  Under the Plan, Murray was entitled to severance benefits

11  only if he suffered a "qualifying termination," i.e., his job was eliminated and he was not offered a

12  "functionally equivalent" position.  Both the Plan and relevant ERISA law grant the Plan

13  Administrator broad discretion to determine whether Murray met the requirements under the Plan.

14  This Court's ability to supersede that judgment is limited to those circumstances where the Plan

15  Administrator abused its discretion.  There has been no such abuse of discretion here.

16      The Claim Administrator and Plan Administrator examined the Administrative Record and

17  concluded that Murray was offered a position where he received the same pay, the same benefits,

18  worked in his same field of finance, and had largely the same duties as his previous position with his

19  prior employer, Guidant Corporation ("Guidant").  To the extent there was any perceived change in

20  the scope of his responsibilities or the reporting structure, that was a result of the fact that the once

21  independent Guidant was now part of Abbott's much larger corporate structure, not a result of any

22  real job change.  In any event, Murray's position was certainly not "eliminated" within the meaning

23  in the Plan.

24      But even if his position was "eliminated", the Claim Administrator and Plan Administrator

25  reasonably concluded that Murray had been offered a functionally equivalent position; a position

26  that utilized the same skill set and provided the same compensation and benefits package.  That is all

27  that the Plan was required to do.  As such, Plaintiff's claim for benefits was properly denied.

28

1    Accordingly, Plaintiff is not entitled to his requested relief, and Defendant is entitled to judgment on

2    the Administrative Record.

3                                      **FACTUAL BACKGROUND**

4    **I.     The Parties**

5           Prior to his employment with Abbott, Murray was employed by Guidant Corporation

6    ("Guidant"). *See* Administrative Record at 18 (hereinafter "AR __").[1]  Before 2004, Murray was a

7    Vice President of Finance and held various positions in which his responsibilities included

8    managerial analysis and financial performance, measurement, and planning. AR 18.  Between

9    August 2004 and April 2006, Murray was a Vice President of Finance, with responsibilities for

10   financial management of three Guidant business segments: Vascular Intervention ("VI"), Cardiac

11   Surgery ("CS"), and Endovascular Solutions ("ES"). AR 18.  During this period he reported to

12   Guidant's Chief Financial Officer. *Id.*

13          On or about April 21, 2006, Abbott purchased the VI and ES segments from Guidant.[2]  AR

14   10, 22.  Abbott then began the process of integrating the portions of Guidant it had purchased into

15   the existing Abbott organization. *Id.* at 18, 45.  Abbott asked Murray to continue in his position as

16   Vice President, Finance, focusing on VI (now called "Cardiac Therapies"), which now resided

17   within the larger Abbott enterprise. AR 18.  Murray's grade level, compensation, benefits, and

18   bonus eligibility remained the same. *Id.*  Murray was also offered a retention package consisting of

19   a change in control benefit, a retention bonus, and 7,000 restricted stock units. *Id.*

20   **II.    The Abbott Severance Pay Plan For Former U.S. Guidant Employees, 2006 Edition**

21          **A.     The Establishment Of The Plan**

22          In connection with its acquisition of Guidant Vascular Intervention and Endovascular

23   Solutions business groups, Abbott established the Plan.  By its terms, the Plan was intended to

24   provide a certain level of benefits to Guidant employees who joined Abbott on April 21, 2006, if

25   their employment terminated "because of certain events specified in the Plan." AR 2, 17.

---

[1]      The Administrative Record was filed on July 31, 2008 at docket entry no. 23.  It is Bates-stamped AR 1 through AR 53 and will be referenced herein using that numbering.

[2]      The third segment, CS, was purchased by a different company, Boston Scientific. *Id.* at 22.

1  **B.    Plan Eligibility**

2    The Plan generally provides that an employee is entitled to certain pay and benefits,

3  including a lump sum cash severance payment and continued health and welfare benefits for a

4  certain period of time, if: (1) his or her employment constitutes a "qualifying termination"; and (2)

5  he or she is a participant in the Plan as of the "qualifying termination" date. AR 2-3. Section 4b. of

6  the Plan outlines the circumstances entitling a participant to certain pay and benefits if he or she

7  incurs a "qualifying termination" and signs (and does not revoke) a Separation Agreement and

8  Release. AR 2.

9    A "qualifying termination" is defined as "a termination of regular employment with Abbott

10 due to a permanent reduction in force or the elimination of your job or position." AR 2. If a

11 participant's employment is terminated for any of the following reasons, *inter alia,* there is no

12 qualifying termination and the participant is *not* entitled to any of the pay and benefits described in

13 the Plan: (1) employee-initiated voluntary resignation; (2) if, after a merger or acquisition, the

14 employee continues employment with the new organization without an extended break in service; or

15 (3) any termination other than one that is directly due to a permanent reduction in force or the

16 elimination of the employee's position. AR 3.

17    Under the terms of the Plan, an individual will also not sustain a qualifying termination if:

18
> either before or after you receive a Notice, you accept an offer of
> employment in another position with Abbott, **or you decline an**
19 > **employment offer from Abbott for a position that Abbott considers**
> **to be functionally equivalent to your current position and that will**
20 > **not require you to relocate.**

21 AR 3 (emphasis added).

22    Finally, the designated Plan Administrator has the "sole discretion to determine whether a

23 position is functionally equivalent" to the employee's current position and, more broadly, "has the

24 discretionary authority to interpret all Plan provisions and to determine all issues arising under the

25 Plan, including issues of eligibility, coverage and benefits." AR 3, 6.

26 **C.    The Claims Process**

27    The Plan provides that any claim for benefits must be made in writing and submitted for

28 consideration to the Corporate Benefits Department of Abbott Laboratories ("Claim Administrator")

4

1   that has been delegated authority by the Plan Administrator to consider initial claims for benefits.

2   AR 6. If a claimant is not satisfied with the Claim Administrator's decision, he or she may request

3   an appeal. AR 7. All appeals of an adverse decision by the Claim Administrator must be submitted

4   to the Plan Administrator, Abbott's Senior Vice President of Human Resources. AR 7, 10.

5        As noted above, the Plan states that the Plan Administrator "has the discretionary authority to

6   interpret all Plan provisions and to determine all issues arising under the Plan, including issues of

7   eligibility, coverage, and benefits." AR 6. The Plan Administrator is charged with the task of

8   making a full and fair review of the appeal. AR 7. If a claimant is not satisfied with this decision,

9   he or she may file a lawsuit in federal court under Section 502(a) of ERISA. AR 8.

10  **III.    Plaintiff Resigns And Seeks Severance Benefits Under The Plan**

11       **A.    Plaintiff's Initial Claim For Benefits**

12       On May 11, 2006, Murray resigned from his position as a Vice President, effective May 12,

13  2006. AR 14. On this same date, Murray submitted a claim under the Plan.[3] AR 14. Murray's

14  claim consisted of a one page letter and did not include any supporting statements or documentation

15  in support of his claim under the Plan. *Id.*

16       By letter dated August 11, 2006, the Claim Administrator denied Murray's claim for

17  severance benefits. The Claim Administrator outlined two reasons for denying Murray's claim for

18  benefits, each of which is independently sufficient to deny Murray's claim for benefits. First, under

19  the provisions of the Plan, the Claim Administrator found that Murray did not suffer a "qualifying

20  termination" because his employment was not terminated as a result of a permanent reduction in

21  force or a position elimination. AR 19. The Claim Administrator found that, under the terms of the

22  Plan, an employee-initiated voluntary resignation is not considered a qualifying termination because

23  an employee who voluntary resigns is ineligible for benefits based on the plain language of the Plan.

24  AR 19. Additionally, the Claim Administrator concluded that an individual is not eligible for

---

25  [3]    In addition to his claim under the Plan, Murray's claim also sought benefits under another
26  plan, the Guidant Corporation Change in Control Severance Pay Plan for Select Employees. AR 16.
    By letter dated July 21, 2006, Abbott agreed to provide Murray with a payment of $641,473.57, in
27  settlement of any claims he may have had under the Change in Control Severance Pay Plan for
    Select Employees. Thus, at this stage, only Murray's claim under the Plan is at issue, not any of the
28  other plans referenced in Murray's initial claim.

1  benefits when an employee is hired by the new organization without an extended break in service.

2  *Id.* Here, the Claim Administrator concluded that Abbott sought to continue to employ Murray on

3  even more favorable terms than he had in his pre-close position. *Id.*

4          As a second basis for denial of Murray's claim, the Claim Administrator found that the Plan

5  also states that if an individual declines an employment offer from Abbott for a position that Abbott

6  considers to be functionally equivalent to the claimant's pre-close position, he is not eligible for

7  benefits. AR 19. The Claim Administrator performed an analysis of Murray's position pre-close

8  and the position offered by Abbott. *Id.* Although the positions were not identical, Murray's grade

9  level, skill set, and experiences would be similar in the post-close position. *Id.* The Claim

10  Administrator determined that Murray was a Vice President, Finance for Guidant pre-close and

11  would be a Vice President, Finance post-close for the same functional area, but as part of a larger

12  corporation, Abbott. *Id.* The Claim Administrator concluded that the Abbott position utilized the

13  same skills, education, and experience necessary for the position of Vice President, Finance. *Id.*

14  Accordingly, the Claim Administrator concluded that Plaintiff was offered a functionally equivalent

15  position and, therefore, was not entitled to benefits under the Plan. *Id.*

16          **B.    Plaintiff's Appeal**

17          Plaintiff appealed the Claim Administrator's decision, and on March 19, 2007, the Plan

18  Administrator sent Plaintiff a letter denying his appeal. In his appeal letter, Plaintiff alleged that he

19  disagreed with the Claim Administrator's decision that he was offered a functionally equivalent

20  position. AR 21. Plaintiff argued that the position Abbott offered him was a junior position that had

21  less scope, visibility, and responsibilities because he would only be supporting one business unit

22  versus the three he supported immediately prior to the Abbott acquisition of VI (now CS) and ES.

23  AR 22. Plaintiff argued that his duties were significantly reduced in that his prior role contained

24  duties and responsibilities besides finance, the reporting relationships changed, the financial

25  reporting responsibilities changed, the amount of revenue responsibilities changed, and taxation

26  duties changed. AR 22. Plaintiff alleged that the position offered by Abbott was at a reporting level

27  parallel to lower positions. AR 23.

28

Defendant's Notice Of Motion And Motion For Summary Judgment Or Summary Adjudication
And Memorandum Of Points And Authorities In Support Thereof, Case No. C08-00906 JW

1    Plaintiff also argued that his position was eliminated and, therefore, that he did suffer a

2  qualifying termination.  AR 37.  In support of this argument, Plaintiff pointed to the notes of an in-

3  house Abbott attorney contained in the Administrative Record.  In addition, Plaintiff suggested that

4  the manner in which Abbott filled Plaintiff's position and later reorganized the finance department

5  should be considered in determining whether he was eligible for benefits (AR 23, 37), but did not

6  identify any Plan provision that acknowledged such a factor as a relevant consideration.  *Id.*

7    The Plan Administrator reviewed Plaintiff's appeal as well as the initial claim denial by the

8  Claim Administrator and determined that Plaintiff was not entitled to any benefits under the Plan.

9  First, the Plan Administrator addressed Plaintiff's claim that his position was eliminated and,

10  therefore, he was entitled to benefits under the plan because he suffered a qualifying termination.

11  AR 37.  The Plan Administrator responded stating that it is the Plan Administrator that must

12  ultimately interpret the terms of the Plan.  AR 51.  In doing so, the Plan Administrator interpreted

13  the term job elimination to "involve situations where business exigencies require downsizing or the

14  complete elimination of a position due to functional redundancies within the Abbott organization."

15  *Id.*  The Plan Administrator explained that the Plan does not provide benefits where a person's

16  employment is continued in a modified form in order to fit within the Abbott business model.  AR

17  51.  Here, although Plaintiff's position may have been modified to fit within the Abbott business

18  model, it was certainly not eliminated.  The Plan Administrator determined that the "finance function

19  intended for Mr. Murray continues to be an element of the Abbott post-Close business model."  *Id.*

20  Abbott's inability to provide Murray with a position that "replicated each and every one of his pre-

21  Close duties" is not a job elimination within the Plan terms.  AR 51.

22    The Plan Administrator advised Murray that although he asserted in his appeal that the

23  handwritten notes constituted evidence that Abbott determined his position was eliminated, the hand

24  written notes were part of the information gathering process.  AR 51.  The duty to interpret the terms

25  of the Plan and ultimately apply the terms of the Plan lies with the Plan Administrator and his

26  delegates, not the author of the handwritten notes.  *Id.*  Since Murray's position was not eliminated,

27  he did not experience a qualifying termination and is not eligible for benefits under the Plan.

28

1    Second, the Plan Administrator addressed the argument that Murray is not entitled to benefits

2    under the Plan because he was offered a functionally equivalent position by Abbott.  Under the terms

3    of the Plan, it is in Abbott's sole discretion to determine functional equivalence.  AR 51.  The Plan

4    Administrator interpreted functional equivalence to be based on general function, rather than specific

5    duties.  AR 52.  The finance position offered to Murray was functionally equivalent to his pre-close

6    position within the Abbott business model.  *Id.*  He received the same compensation and benefits and

7    maintained a position in the same functional area.  Murray chose to resign and not pursue this

8    position.  Therefore, the Plan Administrator concluded that Murray was not eligible for benefits

9    under the terms of the Plan.  AR 51-52.

10   **C.    Plaintiff's Complaint**

11   Pursuant to the Plan and Section 502(a) of ERISA, Plaintiff filed a Complaint in this Court

12   on February 12, 2008, seeking review of the Claim Administrator's and Plan Administrator's denial

13   of benefits.  This Complaint is now ripe for determination on cross motions for summary judgment.

14   **ARGUMENT**

15   **I.    Standard Of Review**

16   **A.    The Abuse Of Discretion Standard Applies**

17   This Court may only disturb an administrator's decision denying a claim for severance

18   benefits when there has been an abuse of discretion.  In *Firestone Tire & Rubber Co. v. Bruch,* 489

19   U.S. 101, 115 (1989), the Supreme Court held that an abuse of discretion standard of review applies

20   where a plan gives the administrator "discretionary authority to determine eligibility for benefits or

21   construe terms of the Plan."  *Id.*  Discretionary authority hinges on whether a plan grants the

22   administrator "authority to determine eligibility for benefits or to construe the terms of the plan."

23   *Gilliam v. Nevada Power Co.,* 488 F.3d 1189, 1193 (9th Cir. 2007).

24   Here, the Plan at issue clearly and unambiguously gives the Plan Administrator the

25   unqualified discretion to determine eligibility for benefits.  Specifically, the Plan provides that the

26   Plan Administrator "has the discretionary authority to interpret all Plan provisions and to determine

27   all issues arising under the Plan, including issues of eligibility, coverage and benefits," and further

28   gives the Administrator the authority to delegate its responsibilities under the Plan.  AR 6.

8

1    This same language is regularly granted discretionary review by the Ninth Circuit. *Jordan v.*

2   *Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 875 (9th Cir. 2004) (finding

3   language granting administrator "discretion to construe and interpret the terms of the Plan" sufficient

4   to grant discretionary authority); *see also Friedrich v. Intel Corp.,* 181 F.3d 1105, 1110 n.5 (9th Cir.

5   1999) (finding language granting administrator "sole discretion to interpret the terms of the Plan"

6   sufficient to grant discretionary authority).  The Ninth Circuit has made it clear that where, as here,

7   the Plan specifically states that the Plan Administrator has the discretionary authority to interpret all

8   Plan provisions and to determine all issues arising under the Plan, the abuse of discretion standard

9   applies. *Jordan,* 370 F.3d at 875 (stating that language in plan "discretion to construe and interpret

10   the terms of the Plan" sufficient to grant discretionary authority).

11    The same deferential standard of review also applies to the Claim Administrator's

12   determination.  It is well established that an ERISA fiduciary can delegate its fiduciary

13   responsibilities to either another named fiduciary or a third party if the plan establishes procedures

14   for such delegation. *Madden v. ITT Long Term Disability Plan for Salaried Employees,* 914 F.2d

15   1279 (9th Cir. 1990) (abuse of discretion standard applied because plan gave discretionary authority

16   to plan administrator and fiduciary who delegated its authority to a third party as required under the

17   plan).  Here, the Plan provision is clear that the Plan Administrator had the authority to delegate its

18   duties.  AR 6.

19    The abuse of discretion standard sets a very high bar that Plaintiff here cannot clear.  The

20   standard is the "least demanding form of judicial review of an administrative action." *Killian v.*

21   *Healthsource Provident Adm's, Inc.,* 152 F.3d 514, 520 (6th Cir. 1998).  As such, the Plan

22   Administrator's determinations are granted significant deference. *Winters v. Costco Wholesale*

23   *Corp.,* 49 F.3d 550, 553 (9th Cir. 1995), *cert. denied,* 516 U.S. 908 (1995).  The Plan

24   Administrator's decision need only merely be rational and based upon a reasonable interpretation of

25   the Plan's terms, and made in good faith. *See Estate of Shockley v. Alyeska Pipeline Service Co.,*

26   130 F.3d 403, 405 (9th Cir. 1997); *see also Martin v. Cont'l Cas. Co.,* 96 F. Supp. 2d 983, 990 (N.D.

27   Cal. 2000).

28

9

Defendant's Notice Of Motion And Motion For Summary Judgment Or Summary Adjudication
And Memorandum Of Points And Authorities In Support Thereof, Case No. C08-00906 JW

1    In short, relevant evidence that reasonable minds might accept as adequate to support its

2    decision is all that is required, even if it is possible to draw inconsistent conclusions from the

3    evidence. *Martin,* 96 F. Supp. 2d at 989.  The Plan Administrator's decision can only be overturned

4    if the decision is "so patently arbitrary and unreasonable as to lack foundation in factual basis."

5    *Oster v. Barco of Cal. Employees' Ret. Plan,* 869 F.2d 1215, 1218 (9th Cir. 1988).  That is not the

6    case here.

7    **II.    The Plan Properly Denied Plaintiff's Claim For Benefits**

8        **A.    The Plan's Denial Of Benefits Was Not An Abuse Of Discretion**

9        The Administrative Record unequivocally demonstrates that there was a rational basis for the

10   decision because the record before the Plan Administrator showed that Plaintiff did not meet the

11   eligibility criteria for receipt of severance benefits for two reasons: (1) Murray did not experience a

12   qualifying termination because his position was not eliminated; and (2) assuming *arguendo,*

13   Plaintiff's position was eliminated, he was offered and refused to accept a functionally equivalent

14   position.  If either basis meets the abuse of discretion standard, Defendants' motion must be granted.

15       **1.    Murray's Position Was Not Eliminated**

16       Both the Claim Administrator and the Plan Administrator based their decision that Murray's

17   position was not eliminated on their inherent power to interpret the terms of the Plan and the reality

18   of the circumstances involved in a corporate transaction.  As detailed above, the Plan Administrator

19   provided a "reasoned explanation" for how he chose to interpret the term "job elimination."  The

20   Plan Administrator determined that a job elimination constitutes "the complete elimination" of a

21   position.  AR 51.  Here, although Plaintiff's position may have been modified to fit within the larger

22   Abbott business structure, it was clearly not eliminated.  *See* discussion *supra.*  The Plan

23   Administrator's actions, therefore, fell within the discretion granted under the Plan.  *Smith v. United*

24   *Television, Inc. Special Severance Plan,* 474 F.3d 1033, 1037 (8th Cir. 2007) (finding committee's

25   interpretation of language in severance plan reasonable based on goals and language of plan).

26

27

28

1

### 2.    Murray Was Offered And Declined A Functionally Equivalent Position

2       Under the terms of the Plan, the Plan Administrator also has the sole discretion to determine

3  whether a new position is the functional equivalent of an individual's prior position.  The Plan did

4  not require that functional equivalence be interpreted as identical.  AR 52.  If exact equivalence was

5  intended under the terms of the Plan, there would be no need for the Plan to reserve such broad

6  discretion to interpret this term.  AR 3, 52 ("Abbott has sole discretion to determine whether a

7  position is functionally equivalent to your current position.").

8       Accordingly, the Claim Administrator and Plan Administrator determined that the position

9  offered to Murray post-close was the functional equivalent of his pre-close position because: (1)

10  Murray's compensation and benefits were not decreased; (2) he was not being asked to perform

11  duties outside his financial management skill set; and (3) the position offered utilized the same skills,

12  education, and experience.  AR 19, 52.  Had he not resigned, Murray would have continued

13  performing duties within his pre-acquisition financial management skill set.  AR. 52.  Clearly, this

14  view is not "so patently arbitrary and unreasonable as to lack foundation in factual basis."  *Oster v.*

15  *Barco of Cal. Employees' Ret. Plan,* 869 F.2d 1215, 1218 (9th Cir. 1988).

16       Moreover, this decision is not only reasonable, but finds express support in the law.  When

17  looking at the issue of functional equivalence, courts consider factors such as: the pay and benefits,

18  the location of the position, the educational background required, and the skill set required.

19  Accordingly, courts have upheld the denial of severance benefits where the plan exercised its

20  discretion to conclude that the claimant did not meet the applicable eligibility requirements,

21  including denying a functionally equivalent position.  For example, in *Awbrey v. Pennzoil Co.,* 961

22  F.2d 928, 931 (10th Cir. 1992)*,* the court determined, when addressing severance pay when a

23  comparable position was offered, that "comparable does not mean identical."  *Id.; see also Garavuso*

24  *v. Shoe Corps. of Am. Industries,* 709 F. Supp. 1423 (S.D. Ohio 1989).  In *Awbrey,* after defendant

25  sold its mine, the new company continued plaintiffs' employment without interruption.  961 F.2d at

26  930.  Plaintiffs claimed benefits under a severance plan.  Defendant argued that all of the Plaintiffs

27  were offered comparable jobs and, therefore, under the terms of the plan, they were not eligible for

28  severance benefits.  *Id.*  The Court in *Awbrey* determined that the employer properly interpreted the

1 | terms of the plan in determining that plaintiff was ineligible for severance benefits as he was offered

2 | a similar position with the same salary. *Id.* at 931.

3 |      In *Otero Carrasquillo v. Pharmacia Corp.,* 466 F.3d 13 (1st Cir. 2006), the First Circuit

4 | upheld a plan's denial of severance benefits where the plan determined that the plaintiff was offered

5 | a comparable position even though his duties were not identical. For example, plaintiff was no

6 | longer on call 24-hours a day, he lost his office, his cellular phone, and beeper, but he was paid the

7 | same salary, performed in the same principal location, and the position required the same

8 | educational background and basic skill level. *Id.* at 15.

9 |      The Plan Administrator's conclusions on both bases offered for denying Murray benefits are

10 | further bolstered when placed within the factual context of this case, where Abbott acquired only a

11 | portion of Guidant and then had to integrate these smaller entities into the existing larger Abbott

12 | business structure. AR 47, 51. Here, two portions of Guidant merged into a much larger

13 | corporation. Murray was offered a position within a much larger finance organization. The fact that

14 | individuals may find themselves subject to additional or realigned reporting structures does not

15 | necessarily alter their job duties, especially in the context of a corporate transaction. *Awbrey*, 961

16 | F.2d at 931. As was found here, both before and after the Abbott acquisition, Murray was generally

17 | performing the same type of duties and retained an equivalent compensation benefits and bonus

18 | package. AR 18, 42. The "inability to provide [him] with a position that replicated each and every

19 | one of his pre-Close duties ... is not a job elimination contemplated by the Plan." *Id.* at 51; *see also*

20 | *Awbrey,* 961 F.2d at 931; *Santini v. Cytec Industries, Inc.,* 537 F. Supp. 2d 1230, 1246-47 (S.D. Ala.

21 | 2008) (finding employee was not entitled to severance benefits because he was offered a position

22 | that was reasonably comparable based on location and compensation than his prior position).

23 |      **B.**    **Plaintiff's Arguments Do Not Support A Contrary Outcome**

24 |      Plaintiff may attempt to overcome summary judgment or summary adjudication by arguing

25 | that other evidence, like the hand-written notes of an Abbott employee, the duties of certain finance

26 | positions following the integration, and the organizational structure of the finance group after he

27 | resigned, supports a finding that he is entitled to severance benefits. However, where, as here, the

28 | Plan Administrator's decision is supported by substantial evidence, the Court must uphold that

12

1  decision even in the face of an equally rational explanation offered by Plaintiff. *Martin,* 96 F. Supp.

2  2d at 989.  When considering whether a plan administrator's decision constitutes an abuse of

3  discretion, a district court is not free to substitute its own judgment for that of the plan administrator

4  as if the court were considering the issue of eligibility for the first time. *Id.*  Given this standard, any

5  argument offered by Plaintiff that simply posits an alternate interpretation is legally irrelevant and

6  should be rejected.

7          First, Plaintiff's appeal disagreed with the Claim Administrator's determination that his

8  position was not eliminated.  AR 21-22, 36-37.  In support of that claim, Plaintiff argued that the

9  hand-written notes of an Abbott employee accurately stated that Plaintiff suffered a job elimination.

10  However, he offers no evidence that the hand-written notes were anything more than information

11  prepared in the information gathering stage.  Moreover, the Plan Administrator specifically noted in

12  his denial that he did not author the notes in connection with his interpretation of the Plan.  AR 51.

13          Even if Plaintiff's position was eliminated, he still is not entitled to benefits under the Plan

14  because he was offered and declined a functionally equivalent position within Abbott.  Plaintiff's

15  argument that the post-close position offered to him involved substantially reduced job

16  responsibilities as his pre-close position misses the mark.  Even though Plaintiff may attempt to

17  present an equally rational interpretation and application of the term functional equivalence, there is

18  absolutely no evidence that the Plan Administrator abused his discretion in making his

19  determinations.  In fact, the Plan Administrator had full discretion to interpret the terms of the Plan.

20          As noted above, a reasoned plan administrator's decision must be upheld even if it is possible

21  to draw inconsistent conclusions from the evidence. *Martin,* 96 F. Supp. 2d at 989.  The Plan

22  Administrator's decision can only be overturned if the decision is "so patently arbitrary and

23  unreasonable as to lack foundation in factual basis." *Oster*, 869 F.2d at 1218.  While Murray's

24  appeal seeks to posit an alternative interpretation, he fails to show that the Plan Administrator's

25  reasoning was "patently arbitrary [or] unreasonable." *Id.*

26          **C.    There Is No Conflict Of Interest**

27          Finally, Plaintiff may argue that a conflict of interest exists in this case since Abbott is the

28  Plan Sponsor and the entity that pays out the benefits.  However, in the absence of evidence showing

13

1  that this potential conflict influenced the Claim Administrator or the Plan Administrator's decision,

2  such an argument must be rejected.

3       In *Metropolitan Life Insurance Co. v. Glenn,* 554 U.S. __, 128 S.Ct. 2343 (2008), the

4  Supreme Court recently outlined how a potential conflict of interest should be taken into account.

5  *Id.* at 2350. As a threshold matter, the Supreme Court determined that a conflict of interest does *not*

6  change the standard of review from abuse of discretion to *de novo. Id.* Instead, the conflict of

7  interest is but one factor among several that a court may consider in reviewing a benefit denial. *Id.*

8  Therefore, the deferential abuse of discretion standard applies in the instant case. Plaintiff offers no

9  evidence, and in fact, none exists, that supports an argument in favor of applying anything other than

10  the arbitrary and capricious standard.[4]

11       The Supreme Court also determined that there must be some sort of evidence that the conflict

12  had a bearing on the decision in order to be considered. *Id.* at 2351. For example, a conflict of

13  interest will be less important where circumstances suggest that "the administrator has taken active

14  steps to reduce potential bias and to promote accuracy." *Id.; see also Nolan v. Heald College,* No.

15  C05-03399 MJJ, 2007 WL 878946, at *12-13 (N.D. Cal. Mar. 21, 2007) (finding that the "level of

16  skepticism with which a court views a conflicted administrator's decision may be low if … [a

17  conflict] is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a

18  parsimonious claims-granting history.").[5] In this case, the Plan Administrator thoroughly reviewed

19  Plaintiff's claim and all of his arguments. Plaintiff has provided no evidence undercutting the

20  soundness of the Plan Administrator's analysis. If any conflict of interest existed, the Plan

21  Administrator ensured that it would have no bearing on his decision regarding benefits.

22       Moreover, the Supreme Court held that a conflict "should prove more important … where

23  circumstances suggest a higher likelihood that it affected the benefits decision, including, but not

---

24

25  [4]    Even if the Court applied a *de novo* standard of review in the instant case, Plaintiff's claim
     still fails. Plaintiff has not and cannot provide any evidence undercutting the sound reasoning

26  behind the Plan Administrator's decision except his own self-serving arguments that the post-close
     position was very different than his pre-close position.

27  [5]    The *Nolan* opinion is not designated "NOT FOR CITATION" pursuant to Civil L.R 3-4(e),
     therefore, Defendant is citing to it and attaches it hereto at Exhibit A.

28

1    limited to, cases where an insurance company administrator has a history of biased claims

2    administration." *Glenn,* 128 S. Ct. at 2351.  In this case, Plaintiff cannot show any bias regarding

3    the claim administration process.  In fact, Plaintiff was granted a substantial amount of benefits, over

4    $600,000, under another Plan.  If the conflict affected the benefits decision, the Plan Administrator

5    would have denied Plaintiff's other claim as well.

6                              **CONCLUSION**

7            For the reasons set forth above, this Court should grant judgment on the Administrative

8    Record in favor of the Defendant.

9    Dated:  August 22, 2008                          WINSTON & STRAWN LLP

10                                           _____
                                                   /s/  Joseph J. Torres
11                                          By:  Joseph J. Torres
                                            Attorney for Defendant
12                                          THE ABBOTT SEVERANCE PAY PLAN FOR
                                            FORMER U.S. GUIDANT EMPLOYEES, 2006
13                                          EDITION
                                            _____

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2

        The undersigned, one of the attorneys for Defendant, The Abbott Severance Pay Plan For
Former U.S. Guidant Employees, 2006 Edition, hereby certifies that on August 22, 2008, a true and

3

correct copy of the foregoing DEFENDANT'S NOTICE OF MOTION AND MOTION FOR
SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN

4

SUPPORT THEREOF was filed electronically with the Court.  Notice of this filing will be sent to
parties by operation of the Court's electronic filing system.  Parties may access this filing through

5

the Court's system.

6

7

8
                                                    /s/ Joseph J. Torres
                                                    Joseph J. Torres

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Westlaw.

Slip Copy                                                                 Page 1
Slip Copy, 2007 WL 878946 (N.D.Cal.)

**C**Nolan v. Heald College
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
NOLAN, Plaintiff,
v.
HEALD COLLEGE et al, Defendant.
**No. C05-03399 MJJ.**

March 21, 2007.

Geoffrey V. White, Law Office of Geoffrey V. White, San Francisco, CA, for Plaintiff.
Michael N. Westheimer, Rebecca A. Hull, Sedgwick, Detert, Moran & Arnold LLP, San Francisco, CA, for Defendant.

**ORDER DENYING PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT AND CLARIFYING PREVIOUS ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

MARTIN J. JENKINS, United States District Judge.

## INTRODUCTION

*1 Before the Court is Plaintiff Jeanne Nolan's ("Plaintiff" or "Nolan") Motion to Alter or Amend Judgment.[FN1]Defendants Heald College ("Heald"), Heald College Long Term Disability Plan (the "Plan"), and Metropolitan Life Insurance Company ("MetLife") (collectively, "Defendants") oppose the motion. For the following reasons, the Court **DENIES** Plaintiff's Motion to Alter or Amend Judgment and clarifies its previous Order Denying Plaintiff's Motion for Summary Judgment and Granting Defendants' Motion for Summary Judgment.[FN2]

FN1.Docket No. 65.

FN2.Docket No. 63.

## FACTUAL BACKGROUND

This suit was brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., seeking past and future long term disability ("LTD") benefits under the Plan administered and insured by MetLife. Plaintiff alleges that she is eligible for LTD benefits due to a disabling condition, which has prevented her from working since April 10, 2002. Plaintiff received benefits under the Plan for 24 months, until July 9, 2004. At that point, MetLife terminated her benefits believing that her condition fell within the "neuromusculoskeletal" 24-month limit. Plaintiff twice appealed the termination decision. MetLife denied both of Plaintiff's appeals. Except as otherwise noted, the factual background of Plaintiff's claim history as taken from this Court's Order Denying Plaintiff's Motion for Summary Judgment and Granting Defendants' Motion for Summary Judgment ("Summary Judgment Order") is as follows. (SeeDocket No. 63,Nolan v. Heald College et al., Case No. C05-3399 MJJ.)

**I. Long-Term Disability Under the Plan**

The Plan provides LTD benefits which are funded through a group policy of insurance issued by MetLife to Heald. (Administrative Record ("MET") 1-59.) The maximum Benefit Duration under the Plan for LTD benefits for employees such as Plaintiff, who were under age 60 at the time they allegedly became disable, is age 65. (MET 12.)

Plan participants are entitled to receive LTD benefits if they are "Disabled" (as that term is defined in the Plan), and they became "Disabled" while covered under the Plan. (MET 17.) The Plan defines "Disabled" in pertinent part as follows:

"Disabled" or "Disability" means that, due to sickness, pregnancy, or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

(1) during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Predisability Earnings at your Own Occupation form any employer in your Local Economy; or

(2) after the 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonable qualified taking into account your training, education, experience and Predisability Earnings.

(MET 19-20.) The "Elimination Period" for LTD benefits is 90 days of continuous disability. (MET 12, 18.) Monthly LTD benefits under the Plan begin on the date following the day the participant completes the Elimination Period. (MET 17.) Monthly LTD benefits may end for a variety of reasons, such as when the participant is no longer "Disabled," reaches the Maximum Benefits Duration, or fails to provide required information. (MET 17-18.)

*2 Certain conditions are subject to limits under the Plan. The maximum benefit period for disability due to Neuromusculoskeletal or Soft Tissue Disorder is 24 months. (MET 14, 32-34.) A "Neuromusculoskeletal or Soft Tissue Disorder" includes any disease or disorder of the spine or extremities and the surrounding soft tissue, including sprains and strains of joints and adjacent muscles. (MET 33.) Exceptions to this limitation include radiculopathies (defined as disease of peripheral nerve roots supported by objective clinical findings of nerve pathology). (MET 33-34.)

**II. Chronological Summary of Claim**

**1. Injury and Payment of Benefits For First 24 Months Under the Plan**

On April 10, 2002, Plaintiff was injured at work when her shoe caught on a plastic mat under her chair and she fell backwards, landing on her back. (MET 330.) Plaintiff consulted Dominic Tse, M.D., an orthopedist, who noted that she was unable to sit but could stand, lean against the wall and walk. (MET 330-331.) Dr. Tse ordered x-rays which revealed a fracture of the left wrist and compression fracture of the lumbar spine. (MET 265, 331.)

On April 17, 2002, one week later, Dr. Tse

reevaluated Plaintiff. Dr. Tse recorded that Plaintiff was more comfortable and no longer in acute distress. (MET 262.) Dr. Tse's prognosis was that Plaintiff would be off work for three to four weeks. (*Id.*) On April 23, 2002, Dr. Tse again evaluated Plaintiff and noted that the intensity of Plaintiff's back pain had subsided. (*Id.*)

On May 1, 2002, Dr. Tse evaluated Plaintiff and reported that Plaintiff was "obviously a lot better." (MET 260.) Dr. Tse stated, "She is making good progress and will improve further with time."(*Id.*) During that office visit, Dr. Tse released Plaintiff to return to work on May 6, 2002 with a single work restriction of no lifting over 15 pounds for two weeks, at which point her condition would be reassessed. (MET 260, 344.)

On May 15, 2002, Dr. Tse evaluated Plaintiff and reported that Plaintiff informed him she had been laid off from Heald on May 10, 2002. (MET 258.) Dr. Tse noted that Plaintiff was negotiating with Heald to see if another position would become available. (*Id.*) Dr. Tse stated that Plaintiff would have the same restrictions of no lifting over 15 pounds, and no repetitive bending.(*Id.*)

On June 14, 2002, Dr. Tse provided an update regarding Plaintiff's condition. (MET 257.) Dr. Tse noted that Plaintiff does most things while standing rather than sitting, that Plaintiff remains disabled from the full range of usual and customary occupation, and that Plaintiff was released to return to work but with modifications to avoid prolonged sitting. (*Id.*)

On June 27, 2002, after failing to secure a new position with Heald, Plaintiff submitted a claim for LTD benefits under the Plan. (MET 123-24.) On Plaintiff's claim form, she stated that her date last worked was April 10, 2002 (the date of the accident), not May 10, 2002 (her actual date last worked). (MET 123.)

*3 Subsequently, Dr. Tse submitted an Attending Physician Statement ("APS"), dated July 5, 2002, as part of the LTD claim, describing Plaintiff's condition as an acute compression fracture of the lumbar spine and a fracture of the left wrist. (MET 108.) Dr. Tse disclosed that Plaintiff could work eight hours per day with a job modification of avoiding lifting,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

repetitive bending or prolonged sitting. (MET 109.) Dr. Tse further stated that he expected improvement of Plaintiff's condition in three to six months, and revealed that he advised Plaintiff to return to work as of May 6, 2002, with modifications. (*Id.*)

On July 10, 2002, Plaintiff responded to MetLife's request for clarification of the discrepancies between her claim form and Dr. Tse's APS. (MET 315.) Plaintiff explained that she had wanted to return to work; that Dr. Tse reluctantly agreed to allow her to attempt to return to work; that subject to Dr. Tse's limitations, she should not exceed 3 hours work in a day; that after attempting to work on 5 occasions it became clear that she could not perform even light duty; that she cannot work because she is still limited in her movement and experiencing a great deal of pain and discomfort. (*Id.*) Plaintiff did not inform MetLife that she had been laid off from her position or that she had unsuccessfully negotiated to obtain another position.[FN3] Plaintiff copied Dr. Tse on her clarification letter to MetLife. (MET 315.) Plaintiff also sent Dr. Tse a separate note stating she wanted to make sure MetLife "understood" that she was unable to work. (MET 314.)

> FN3. The record indicates additional discrepancies in Plaintiff's July 10, 2002 clarification. In particular, as of July 10, 2002, there is nothing in the record suggesting that Dr. Tse had restricted Plaintiff to working only three hours per day.

On July 10, 2002, MetLife commenced Plaintiff's LTD benefits in accordance with the 90-day Elimination Period, which ran from April 10, 2002 (the date Plaintiff claimed to have last worked). (MET 152.) Plaintiff later received benefits from Social Security, which Plaintiff offset from her LTD benefits received under the Plan. (MET 137-39, 151, 196.)

On July 19, 2002, Dr. Tse issued a letter echoing Plaintiff's representations made in her July 10, 2002 clarification letter. (MET 328-29, 335.)[FN4] Between August 2002 and October 2002, Plaintiff continued to complain of pain (MET 254), continued to have poor sitting tolerance (MET 251), and continued to engage in physical therapy (*Id* ).

> FN4. At summary judgment, Defendants argued Dr. Tse's July 19, 2002 letter contradicts his earlier reports on May 1 and May 15, 2002, where Dr. Tse described improvement in Plaintiff's condition and her ability to work subject to certain limitations.

On November 21, 2002, Plaintiff received a Functional Capacity Evaluation ("FCE") by Mr. David Pringle ("Pringle"), a physical therapist. (MET 134-35.) Mr. Pringle concluded that Plaintiff could not sit in a sedentary position for more than 8 minutes at a time and that sitting was not suggested for more than 1 hour per day at no greater than 10 minute increments, although Mr. Pringle opined that Plaintiff was capable of engaging in sedentary work. (MET 135, 582, 601)

On December 11, 2002, Plaintiff saw Dr. Tse for a review of an MRI of her spine taken on November 26, 2002 and review of Mr. Pringle's FCE. (MET 248.) Dr. Tse noted that Plaintiff could work in a sedentary physical demand level although her sitting tolerance was poor, as noted by Mr. Pringle. (*Id.*) Dr. Tse noted that Plaintiff would be changing her treating physician to Robert Minkowsky, M.D. for future consultation. (*Id.*)

*4 On March 23, 2004, MetLife issued a letter to Plaintiff stating that in order for her benefits to continue past July 9, 2004, she had to provide evidence of total disability from any occupation for which she was reasonably qualified. (MET 152-53.) Under the Plan, eligibility benefits change after 24 months from being disabled from the participant's own occupation to being disabled from any gainful occupation for which the participant is reasonably qualified. (MET 19, 152.)

On June 16, 2004, MetLife issued a letter notifying Plaintiff that benefits would terminate effective July 9, 2004, in light of a report by Dr. Minkowsky. (MET 171-72.) Specifically, MetLife cited to Dr. Minkowsky's report of May 22, 2003, related to Plaintiff's claim for workers' compensation, where Dr. Minkowsky noted that Plaintiff had improved functionally, pain was intermittent rather than constant, her ability to walk, sit and stand had markedly increased, and that Plaintiff still had a problem with her spine and musculoskeletal system. (MET 181-82.) MetLife informed Plaintiff that Dr.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                   Page 4
Slip Copy, 2007 WL 878946 (N.D.Cal.)

Minkowsky's diagnoses was subject to the Plan's Limited Benefit Condition. (MET 172.)

On August 2, 2004, Plaintiff wrote to MetLife requesting copies of various documents. (MET 173.) On August 5, 2004, MetLife responded, provided documents to Plaintiff, and notified Plaintiff of her appeal rights. (MET 191-92.)

On August 6, 2004, Plaintiff returned to Dr. Tse for an examination. (MET 242.) Dr. Tse issued a report supporting Plaintiff's claim. (*Id.*) Dr. Tse noted that he had not seen Plaintiff since December 2002 and that Plaintiff continued to have wide-spread areas of musculoskeletal pain with chronic myofacial pain disorder and cervical radicular involvement into a left upper extremity with <u>cervical radiculopathy</u>. (MET 243.)

**2. Plaintiff's First Appeal**

On September 10, 2004, Plaintiff appealed the termination of her LTD benefits. (MET 198-200.) Plaintiff advised MetLife that additional information would be needed before she could complete the appeal. (MET 198.) MetLife sent an acknowledgment on September 17, 2004, advising Plaintiff that she had 180 days from the termination of benefits to submit additional information. (MET 201.)

On September 20, 2004, Plaintiff saw William W. Anderson, M.D., a neurologist. Dr. Anderson concluded that Plaintiff's "<u>problem in the upper extremities</u> is due to bilateral <u>thoracic outlet syndrome</u> manifested by rib dysfunction, the first rib being superiorly displaced on the right and evidence of rib torsions on the upper ribs on the left side" and that this problem was causing radicular pain. (MET 527-28)

On December 13, 2004, Plaintiff sent another appeal letter, with medical reports, stating, "We are still awaiting one further medical report, but will submit it as soon as it is received."(MET 202-12.) On December 16, 2004, MetLife responded that the 180-day period to submit her appeal was expiring that day, but in light of her request to submit additional information, an extension of 30 days would be granted. (MET 367.)

*5 On December 17, 2004, Plaintiff sent another report to MetLife that contained Dr. Tse's report and a summary of Plaintiff's medical visits with various doctors. (MET 368-73.) On December 21, 2004, MetLife responded that the additional report had been received and the claim had been referred for an independent medical review. (MET 380.)

MetLife submitted Plaintiff's file to Richard Silver, M.D., an orthopedic surgeon, for a physician medical review. (MET 386-391.) On January 17, 2005, Dr. Silver issued a report opining that Plaintiff

"is capable of being gainfully employed and has been capable of being gainfully employed for a prolonged period of time dating back to the FCE on 11/21/02, which shows that she could do sedentary gainful employment ... [Plaintiff] is able to work in a sedentary capacity ... [T]he medical documentation does not support functional limitations ... [Plaintiff's] subjective complaints are unsubstantiated by objective clinical findings that would preclude her from working as an administrator in a sedentary capacity ... [Plaintiff] is capable of working."

(MET 387-88.)

Dr. Silver also opined that the records did not show a condition that fell within one of the exceptions to the Plan's 24-month benefits limitation for neuromusculoskeletal disorders. (MET 389.) "From an orthopedic perspective, [Plaintiff] does not have a <u>radiculopathy</u>... and the condition that she is claiming does not support functional limitations from 7/10/04 to the present time."(*Id.*) Dr. Silver also conducted a Physical Capacities Evaluation and found Plaintiff could work with limited restrictions of no lifting over 20 pounds or frequently lifting over ten pounds, among other limitations. (MET 390-391.)

On January 24, 2005, MetLife denied Plaintiff's appeal on two grounds: (1) insufficient evidence of an exception to the 24-month limitation on neuromusculoskeletal disorders, and (2) insufficient evidence of impairment of a severity that would prevent Plaintiff from performing "any occupation." (MET 392-396.) MetLife informed Plaintiff that she had exhausted her administrative remedies under the Plan, that no further appeal would be considered, and that Plaintiff had a right to bring a civil action under ERISA. (MET 396.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

On February 15, 2005, Plaintiff wrote to MetLife contesting the denial of her appeal. (MET 397-98.) Plaintiff argued that denial was improper because the denial added an additional grounds for denial when compared with the original termination letter. (*Id.*) Plaintiff complained that the result was unfair because she had no opportunity to rebut Dr. Silver's findings, and because the full record supported her continued receipt of benefits. (*Id.*)

MetLife agreed to provide a further appeal review and on February 24, 2005, MetLife issued a letter to Plaintiff's counsel enclosing a copy of the claim file. (MET 530.) On March 31, 2005, MetLife notified Plaintiff that even though she was previously informed that she had exhausted her administrative review process, MetLife would nevertheless conduct one further review of her claim. (MET 531-32.) MetLife gave Plaintiff until June 10, 2005 to provide any additional information she wished to submit. (MET 532.)

**3. Plaintiff's Second Appeal**

*6 On June 9, 2005, Plaintiff submitted her second appeal. (MET 533-536.) Plaintiff argued that Dr. Silver was wrong in opining that she could hold a sedentary job. (*Id.*) Plaintiff submitted additional medical documents and opinions from her own doctors. (*Id.*) Subsequently, Plaintiff submitted a July 14, 2005 report from Jeff Malmuth, M.S., a vocational counselor, opining that Plaintiff was not capable of performing sedentary work. (MET 599-605.)

MetLife submitted Plaintiff's file, including all of Plaintiff's appellate paperwork for a second physician medical review. James Jares, III, M.D., a neurologist, conducted the review. (MET 580-89.) On July 1, 2005, Dr. Jares issued a report in which he opined that Plaintiff "retain[ed] the ability to work full time in a sedentary position with the allowance of reposition as necessary for comfort."(MET 585.) Regarding the Plan's 24-month limitation for neuromusculoskeletal disorders, Dr. Jares noted that Plaintiff "has some clinical features consistent with the exclusionary diagnosis [i.e., conditions that are an exception] but these appear to have occurred later in the course of her illness and not at the exact time of her injury in April 2002."(MET 586.)

MetLife asked Dr. Jares to clarify when Plaintiff had developed a condition that could be within an exception to the 24-month limit. (MET 608-609.) On July 25, 2005, Dr. Jares prepared a supplemental report explaining that the opinion at issue was reflected by Dr. Minkowsky on January 27, 2003, and Dr. Tse on August 6, 2004. (MET 608-09.) However, Dr. Jares opined, "My conclusions about [P]laintiff's ability to work [that is, that she was able to work] have not changed."(*Id.*)

MetLife asked Dr. Jares for further clarification. Dr. Jares prepared another report dated August 10, 2005. (MET 611-12.) Dr. Jares stated, "Upon review, the L1 compression fracture that [Plaintiff] experienced in April 2002 does not fall into one of the listed exclusionary categories."(MET 612.) Dr. Jares did note that cervical radiculopathy was present prior to July 10, 2004, based upon Dr. Tse's earlier findings. (*Id.*)

On September 19, 2005, MetLife issued a letter to Plaintiff denying her second appeal.[FN5](MET 613-15.) Regarding Plaintiff's diagnosis of radiculopathy, the letter reads,

> FN5. As more fully explained below, the Court incorrectly cited to the contents of the September 19, 2005 letter in the Summary Judgment Order.

We have completed our review of the termination of [Plaintiff's] claim for disability benefits. Based on our review of the available information, it has been determined that [Plaintiff] as [sic] been diagnosed with one of the exclusions in the limited benefit condition of the Plan. It has been concluded that [Plaintiff] does have been [sic] diagnosed with radiculopathy and does have a condition that is noted as one of the exclusions of the plan.... Review of the information that has been submitted on appeal, along with the information on record, does support that [Plaintiff] has been diagnosed with one of the exclusions in the limited benefit condition of the Plan.
*7 (MET 613-614.) Regarding Plaintiff's ability to perform her own occupation, the letter reads that

it has been determined that the medical information does not support a severity of impairment that would

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

prevent [Plaintiff] from performing her own job....
Review of the information on file is also insufficient
to support a severity of functional impairment that
would prevent [Plaintiff] from working in a sedentary
capacity. Therefore [Plaintiff] can not be considered
disabled as defined by [the Plan] and no further
benefits are payable.

(*Id.*) The letter noted that a physician consultant,
board certified in neurology, reviewed the entire
claim file and determined "that from a neurological
perspective, the medical records support that
[Plaintiff] retains the ability to work full time in a
sedentary position with the ability to reposition as
necessary for comfort."(MET 614.) The letter further
indicated that another physician consultant, board
certified in orthopedic surgery, similarly determined
that Plaintiff "has no loss of functionality in any
aspect of the cervical thoracic, lumbrosacral spine, or
of the entire vertebral spine. The consultant notes that
[Plaintiff] is capable of working in a sedentary
capacity."(*Id.*)

### PROCEDURAL HISTORY

On September 12, 2006, the parties filed cross
motions for summary judgment. The parties filed
over 1000 pages of administrative record in support
of their motions. The administrative record consisted
primarily of claims history, medical records, and
correspondence. On November 14, 2006, after
consideration of the pleadings, the administrative
record, and the arguments of counsel, this Court
denied Plaintiff's motion for summary judgment and
granted Defendants' motion for summary judgment.
(*See id.*)Plaintiff's now seek reconsideration of the
Court's grant of summary judgment.

### LEGAL STANDARD

A district court may reconsider its grant of summary
judgment under either <u>Federal Rule of Civil
Procedure 59(e)</u> (motion to alter or amend a
judgment) or Rule 60(b) (relief from
judgment).*School Dist. No. 1 J v. ACandS, Inc.*, 5
<u>F.3d 1255, 1263 (9th Cir.1993),</u> *cert. denied,*<u>512 U.S.
1236, 114 S.Ct. 2742, 129 L.Ed.2d 861 (1994)</u>. While
<u>Rule 59(e)</u> permits a district court to reconsider and
amend a previous order, the rule offers an
"extraordinary remedy, to be used sparingly in the
interests of finality and conservation of judicial

resources."*Carroll v. Nakatani*, 342 F.3d 934, 945
(9th Cir.2003) (citing Carroll 12 James Wm. Moore
et al., *Moore's Federal Practice* § 59.30[4] (3d
ed.2000)). Indeed, "a motion for reconsideration
should not be granted, absent highly unusual
circumstances, unless the district court is presented
with newly discovered evidence, committed clear
error, or if there is an intervening change in the
controlling law."*Kona Enterprises, Inc. v. Estate of
Bishop,* 229 F.3d 877, 890 (9th Cir.2000) (citations
omitted). A <u>Rule 59(e)</u> motion may not be used to
raise arguments or present evidence for the first time
when they could reasonably have been raised earlier
in the litigation. *Id.*

**\*8** The Ninth Circuit has identified three reasons
sufficient to warrant a court's reconsideration of a
prior order: (1) an intervening change in controlling
law; (2) the discovery of new evidence not previously
available; and (3) the need to correct clear or
manifest error in law or fact, to prevent manifest
injustice. *ACandS, Inc.,* 5 F.3d at 1263. Upon
demonstration of one of these three grounds, the
movant must then come forward with "facts or law of
a strongly convincing nature to induce the court to
reverse its prior decision."*Donaldson v. Liberty Mut.
Ins. Co.,* 947 F.Supp. 429, 430 (D.Haw.1996).
Whatever may be the purpose of <u>Rule 59(e)</u> it should
not be supposed that it is intended to give an unhappy
litigant one additional chance to sway the judge.
*Illinois Central Gulf Railroad Company v. Tabor
Grain Company,* 488 F.Supp. 110, 122 (N.D.Ill.1980)
(a rehash of the arguments previously presented
affords no basis for a revision of the court's order).

### ANALYSIS

#### I. Summary Judgment

In deciding the parties' cross motions for summary
judgment, this Court found that the proper standard
of review was abuse of discretion because the Plan
unequivocally conferred discretion on MetLife to
determine eligibility benefits and to construe the
terms on the Plan. (Summary Judgment Order, 12:13-
13:1.) Recognizing that MetLife acted as both the
Plan administrator and funding source, this Court
reviewed the case "tempered by skepticism
commensurate with the plan administrator's conflict
of interest," as the Ninth Circuit has instructed.
*Abatie,* 458 F.3d at 959.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

In making its determination, this Court found that MetLife's decision to grant LTD benefits to Plaintiff during the initial 24-month period belied Plaintiff's contention that the decision-making process was tainted by a conflict of interest. (Summary Judgment Order, 16:2-14.) The Court also noted that MetLife agreed to pay LTD benefits to Plaintiff despite the fact that Plaintiff's own doctor had initially found her able to return to work, and that MetLife afforded Plaintiff a second appeal despite the fact that neither ERISA or the Plan required MetLife to do so. (*Id.*) As a result, the Court did not find evidence of a conflict of interest that effected the decision-making process.

Next, this Court determined that MetLife's benefit determinations were not inconsistent. This Court stated, "[a]s a result of the Plaintiff's subsequent appeals and her efforts to generate evidence for continued benefits, MetLife considered new evidence and determined that Plaintiff was not functionally impaired from performing her job and that her medical records did not show the existence of any diagnosis that would be an exclusion to the 24-month limitation for Plan benefits."(*Id.* at 17:1-5.)

Lastly, in concluding that MetLife did not abuse its discretion in terminating and denying Plaintiff's LTD benefits, the Court made two findings. First, regarding the exception to the 24-month limitation under the Plan, the Court found that MetLife did not abuse its discretion in determining that Plaintiff did not suffer from radiculopathy. (*Id.* at 17:8-20:16.)Second, regarding Plaintiff's "disability" under the Plan, the Court found that MetLife did not abuse its discretion in determining that Plaintiff was able to return to work and earn 60% of her disposable income. (*Id.* at 20:17-23:14.)Accordingly, the Court stated, "[a]s a result of MetLife's review and consideration of the entire record, the Court finds that MetLife's decision to terminate and subsequently deny Plaintiff's LTD benefits was not arbitrary and capricious."(*Id.* at 23:12-14.)

*9 In the current motion, Plaintiff argues that the Court erred in fact and law by: (1) finding that MetLife determined that Plaintiff did not suffer from radiculopathy; and (2) failing to conduct the analysis and make findings as required by *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir.2006).

Defendants counter and insist that the Court did not commit error in its factual findings or legal analysis. The Court now turns to Plaintiff's arguments on reconsideration.

**I. Factual Error-Radiculopathy**

Plaintiff points to MetLife's denial letter of September 19, 2005 as evidence that the Court factually erred in finding that MetLife determined that Plaintiff did not suffer from radiculopathy. (MET 613-615.) Plaintiff insists that MetLife's denial letter of September 19, 2005 terminated benefits solely on the ground that MetLife determined that Plaintiff was able to perform her own job and was therefore not disabled under the Plan. Pointing to the Court's alleged error, Plaintiff argues that MetLife was therefore inconsistent in paying benefits to Plaintiff for the first 24 months, thereby not disputing that Plaintiff could not perform her own job, and then later terminating benefits on grounds that Plaintiff could perform her own job. Plaintiff contends that termination of LTD benefits was improper because the record was not supplemented by any new evidence demonstrating that Plaintiff's ability to perform her job had improved after 2004. In opposition, Defendants argue that regardless of whether Plaintiff had radiculopathy, MetLife determined that Plaintiff was not functionally impaired from working in her own occupation and therefore termination of LTD benefits was appropriate. (MET 614.) Defendants also contend that the Court was correct in finding that MetLife did not abuse its discretion in determining that Plaintiff was not disabled under the Plan.

A review of the administrative record reveals that the Court erred in its Summary Judgment Order. In particular the Court erred in finding that MetLife ultimately determined that Plaintiff did not suffer from radiculopathy. (Summary Judgment Order at 9:25.) As indicated by MetLife's September 19, 2005 letter to Plaintiff, MetLife ultimately denied LTD benefits not because MetLife had determined that Plaintiff did not have radiculopathy, but instead because MetLife determined that Plaintiff was capable of performing her own job and was therefore not "disabled" under the Plan. (MET 613-614.) Additionally, MetLife's Appeal Unit's records support Plaintiff's contention that the Court erred here. Specifically, the Appeal Unit's records indicate that a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                        Page 8
Slip Copy, 2007 WL 878946 (N.D.Cal.)

"[r]eview of the claim file supports that [Plaintiff] has radiculopathy supported by objective evidence ... Claim unit needs to determine if medical information submitted supports a disability."(MET 645.) Here, having found that the Court erred regarding MetLife's determination on Plaintiff's radiculopathy, the issue now becomes whether the Court's other finding, regarding MetLife's determination on Plaintiff's "disability," is sound.

*10 The Court concludes that its previous finding, that MetLife did not abuse its discretion in determining that Plaintiff was able to return to work, is correct and supported by the record. The definition of "Disabled" under the Plan changed after the first 24-month period. The Plan reads,

"Disabled" in pertinent part as follows:

"Disabled" or "Disability" means that, due to sickness, pregnancy, or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

(1) during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation from any employer in your Local Economy; or

(2) after the 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonable qualified taking into account your training, education, experience and Predisability Earnings.

(MET 19-20.) As the record indicates, MetLife sought additional medical evidence of ongoing disability prior to the expiration of the initial 24-month period. MetLife based its request on the fact that the Plan's disability definition changed after the initial 24-month period and the express language of the Plan, indicating that Plaintiff's benefits may be denied if she failed to provide satisfactory documents within 60 days of the request. (MET 5, 40.) "Under the terms of the Plan, it is the employee who must continue to supply on demand proof of continuing disability to the satisfaction of the insurance company." *Miller v. Metropolitan Life Ins. Co.*, 925

F.2d 979, 985 (6th Cir.1991). After the initial 24-month period, MetLife determined that Plaintiff was able to earn at least 60% of her predisability earnings at "any gainful occupation" for which Plaintiff was qualified to take. Despite the existence of differing medical opinions, MetLife's determination was supported by the record and was therefore not arbitrary and capricious. (Summary Judgment Order at 21:4-6.)

A review of the record demonstrates that there was ample evidence for MetLife to ultimately determine that Plaintiff was able to return to work and therefore was not "disabled" under the Plan. Admittedly, the record indicates that Mr. Malmuth and Plaintiff's own doctors concluded that Plaintiff was not able to engage in sedentary work. In contrast, Mr. Pringle, Dr. Jares, and Dr. Silver concluded that Plaintiff was able to engage in sedentary work. Dr. Jares and Dr. Silver considered the relevant record and relied on their own Physical Capacities Evaluation and found Plaintiff could work with limited restrictions. (MET 390-91.) Nothing in the record suggests that MetLife or MetLife's reviewing professionals, ignored Plaintiff's complaints or the conclusions and diagnoses of Plaintiff's treating physicians. Instead, Met Life's professionals found Plaintiff's evidence to be either unsubstantiated by objective medical evidence or found that the evidence was not sufficient to justify continuation of LTD benefits. As a result of MetLife's review and consideration of the entire record, the Court finds that MetLife's decision to deny Plaintiff's LTD benefits on grounds that she not "disabled" under the Plan was not arbitrary and capricious. The Court further finds that its previous error regarding MetLife's determination that Plaintiff did not suffer from radiculopathy does not effect the outcome of the final judgment and was therefore harmless.

## II. Legal Error

*11 Plaintiff argues that the Court legally erred by failing to apply the analytical process required by *Abatie.*In particular, Plaintiff avers that the Court erred in: (1) treating the cross-motions for summary judgment as motions for summary judgment, rather than for judgment on the administrative record under Federal Rule of Civil Procedure 52(a); (2) failing to make a determination between competing expert opinions; (3) failing to analyze the independence and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                              Page 9
Slip Copy, 2007 WL 878946 (N.D.Cal.)

the alleged conflict of interest between MetLife and
its reviewing physicians. (Plaintiff's Motion to Alter
or Amend Judgment ("Mot.") at 5:8-23.) The Court
will address Plaintiff's contentions in turn.

**A. Bench Trial**

Plaintiff argues that under an "arbitrary and
capricious" review *Abatie* requires courts to conduct
a bench trial under Rule 52(a) when there is
conflicting evidence in the record. (Mot. at 5:26-6:2.)
The Court disagrees with Plaintiff's interpretation of
*Abatie*. *Abatie* but does mandate a bench trial in the
face of conflicting evidence in the record, but instead
instructs that when a court does conduct a bench trial,
the court must make findings of fact on all contested
issues and issue a ruling under Rule 52 which is
sufficiently explicit to give the appellate court an
understanding of the basis for the court's decision.
*Abatie*, 459 F.3d at 973 (citation omitted). Here, the
Court did not conduct a bench trial and therefore was
not required to make findings under Rule 52 as
Plaintiff contends.

**B. Competing Expert Opinions**

Plaintiff argues that the Court improperly followed
non-Ninth Circuit authority in refusing to make a
credibility determination between competing expert
opinions. Plaintiff's argument misinterprets the
Court's inquiry under an abuse of discretion standard
of review as set forth in *Abatie*. *Abatie*, 459 F.3d at
968-69. Under *Abatie*, as more fully explained below,
the Court considered the conflicting evidence in
determining the appropriate weight to give the
structural conflict of interest that was present on this
record.*Id.* at 970.Plaintiff fails to provide the Court
with authority permitting the Court to make
credibility determinations between competing expert
opinions when reviewing a denial of benefits under
an arbitrary and capricious review.*Compare Semien
v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 814 (7th
Cir.2006) (finding that plan administrator's
physician's reports demonstrated a thorough
consideration of available information to support
finding of disqualification from LTD coverage and
although claimant's treating physicians reached
different conclusions, under an arbitrary and
capricious review, the court will not attempt to make
a determination between competing expert opinions.)
Accordingly, the Court finds Plaintiff's argument here

unavailing.

**C. Conflict of Interest**

Plaintiff's remaining contentions are that the Court
erred in placing the burden on Plaintiff to
affirmatively show "misconduct" in order to establish
a conflict of interest, that the Court improperly
deferred to MetLife's physician reviewers' opinions
despite conflicting evidence from Plaintiff's
physicians, and that the Court erred in failing to
analyze the "independence" of MetLife's physician
medical reviewers. Defendants respond that the Court
properly considered and evaluated the alleged
conflict of interest and correctly determined that there
was no abuse of discretion.

*\*12 Abatie* establishes the abuse of discretion
approach to ERISA cases in which a conflict of
interest exists. *Abatie 458 F.3d at 955*. When
reviewing to determine whether an abuse of
discretion has occurred, the proper review is one
"tempered by skepticism commensurate with the plan
administrator's conflict of interest."*Id.* Such a review
requires a case by case balance weighing the conflict
of interest as a factor in the abuse of discretion
review. *Id.* at 968.In Abatie, the court stated,

The level of skepticism with which a court views a
conflicted administrator's decision may be low if a
structural conflict of interest is unaccompanied, for
example, by any evidence of malice, of self-dealing,
or of a parsimonious claims-granting history. A court
may weigh a conflict more heavily if, for example,
the administrator provides inconsistent reasons for
denial, fails adequately to investigate a claim or ask
the plaintiff for necessary evidence, fails to credit a
claimant's reliable evidence, or has repeatedly denied
benefits to deserving participants by interpreting plan
terms incorrectly or by making decisions against the
weight of evidence in the record.

*Id.* at 968 (citing *Lang v. Long-Term Disability Plan
of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794,
799 (9th Cir.1997), *Booton v. Lockheed Med. Benefit
Plan*, 110 F.3d 1461, 1463-64 (9th Cir.1997); *Black
& Decker Disability Plan v. Nord*, 538 U.S. 822, 834,
123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Unlike de
novo review, review for an abuse of discretion is
generally limited to the administrative record before
the plan administrator at the time of its decision. *Id.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

at 970.However, a court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise. *Id.* (citing *Doe v. Travelers Ins. Co.,* 167 F.3d 53, 57 (1st Cir.1999)).

Here, the Court properly weighed MetLife's structural conflict of interest and the independence of its physician medical reviewers. Contrary to Plaintiff's contention, the Court did not place the burden on Plaintiff to show "misconduct" in order to establish a conflict of interest and a less deferential standard of review. To the extent Plaintiff's interpreted the Court's Summary Judgment Order as placing the burden on them, the Court clarifies that the Order was merely recognizing that there was no evidence of "misconduct" by MetLife in the record, offered by Plaintiff or otherwise. The Court did not intend to imply that Plaintiff had an affirmative duty to produce such evidence. *See Abatie,* 458 F.3d at 967. Furthermore, the Court notes that the record is absent of any "material probative evidence" tending to show that MetLife's conflict of interest caused a breach of its fiduciary obligations to Plaintiff. *Id.* at 966.Rather, the record contains affirmative evidence which demonstrates that MetLife did not breach its fiduciary obligations. For example, as set forth in the Summary Judgment Order, MetLife afforded Plaintiff two opportunities to appeal the termination of her LTD benefits, and also granted Plaintiff benefits for the initial 24-month period despite contradictory reports from her own physician initially indicating that Plaintiff could return to work for 8 hours per day with minor restrictions. Rather than deny Plaintiff's claim due to her doctor's diagnosis, MetLife sought clarification and considered a revised and somewhat contradictory report from Plaintiff's doctor. The Court further notes that MetLife granted Plaintiff extensions of time to augment her appellate submissions.

*13 Regarding MetLife's physician reviewers' independence, the Court considered evidence offered by both parties. In support of Plaintiff's argument that the reviewers were biased, the Court considered extrinsic evidence showing the number of MetLife file reviews completed by Dr. Silver and Dr. Jares,

the amount of compensation they received from MetLife, and their retention through Network Medical Review ("NMR"). In contrast, and in support of the physician reviewer's independence, the Court examined the substance of the actual file reviews. As explained previously, both Dr. Jares and Dr. Silver reviewed Plaintiff's voluminous medical history containing opinions from each of Plaintiff's doctors, including evidence that one of Plaintiff's doctors had offered conflicting opinions about her ability to work after the accident. Dr. Jares and Dr. Silver considered the records and competing opinions and relied on their own Physical Capacities Evaluation [FN6] and found Plaintiff could work with limited restrictions. The medical records indicated that Plaintiff's own doctors had diagnosed Plaintiff as having a condition that would improve over time and they remained optimistic she would eventually return to work."[I]t is not the case that every time a plan administrator discontinues disability benefits, it must produce evidence of medical improvement."*Lawrence v. Motorola, Inc.,* 2006 WL 2460921 at *9 (D.Ariz.2006). As a result of MetLife's review and consideration of the entire record, the Court finds that MetLife's decision to deny Plaintiff's LTD benefits was not arbitrary and capricious. Therefore, the Court **DENIES** Plaintiff's Motion to Alter or Amend Judgment.

> FN6. In her motion, Plaintiff incorrectly states, "The Court apparently assumed that Dr. Silver and Dr. Jares conducted some sort of physical examination or testing of Plaintiff, but his is incorrect."In clarification of the Summary Judgment Order, the Court was aware that Dr. Jares and Dr. Silver conducted Physical Capacity Reviews in reliance on Plaintiff's medical records and assigned weight to those reviews accordingly.

### CONCLUSION

For the foregoing reasons, the Court finds **DENIES** Plaintiff's Motion to Alter or Amend Judgment and clarifies its Summary Judgment Order as set forth above.

**IT IS SO ORDERED.**

N.D.Cal.,2007.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 11
Slip Copy, 2007 WL 878946 (N.D.Cal.)


Nolan v. Heald College
Slip Copy, 2007 WL 878946 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.